ROYAL INSURANCE COMPANY *v.* D. H. ROLAND DRURY ET AL. FIRST MORTGAGEES AND TRUSTEES.

*Fire Insurance—Change of Ownership—Ratification of Mortgage Sale—Note Holders As Purchasers—Waiver of Defense on Policy—Concealment of Facts.*

The ratification of a judicial sale is the equivalent of a valid contract of sale, and as such vests the beneficial interest and ownership in the purchaser, who suffers any loss which happens, and receives any benefit which accrues, to the property, between the date of ratification and the final transfer of the legal title.

p. 222

The ratification of a mortgage foreclosure sale effects a change in the ownership of the mortgaged property within a clause in an insurance policy invalidating the policy in case of such a change.                      p. 225

That the purchasers at mortgage foreclosure sale were the holders of the notes secured by the mortgage did not prevent such sale from effecting a change of ownership, within the meaning of a mortgage clause attached to the policy, requiring the trustees under the mortgage to notify the insurer of any such change, in order to avoid a forfeiture.        pp. 225, 226

A mortgage clause making the loss, if any, payable to the trustees under a deed of trust, does not enure to the benefit of

holders of notes secured by the deed of trust, upon their purchase of the property at foreclosure sale thereunder, such noteholders not being named in either the policy or mortgage, and being unknown to the insurer until after the loss.   pp. 228-230

The insurable interest of trustees under a mortgage is not entirely extinguished by the ratification of a sale under the mortgage, they still having an interest to the extent of the purchase price.                              p. 230

A change in the interest of the insured, which, under the terms of the policy, causes a forfeiture, may be waived by the insurer.                              p. 230

When the insurer, with knowledge of all the facts constituting a breach of a condition or warranty, requires the insured, by virtue of the policy, to do some act or incur some trouble or expense, the forfeiture is deemed to be waived.        p. 230

Requirements and warranties as to sole and unconditional ownership and change of ownership may be waived, by acts and conduct of the insurer himself, or of his agent, having real or apparent authority, provided such acts or conduct occur after the insurer or his agent has full knowledge of the facts giving rise to the breach.                              p. 231

That the insurer, through its agents, carried on negotiations for a year with the insured and their counsel concerning the loss in question, without denying liability, requesting various data, proofs of loss and information from time to time, *held* sufficient evidence that the insurer waived the defense of "change of ownership," to be submitted to the jury.        pp. 231-233

A statement by the insurer that it waives none of its rights, and neither admits nor denies liability, does not prevent the operation of a waiver.                              p. 232

Provisions in the policy, asserting the inability of agents to waive any of its provisions, do not prevent the waiver by the insurer, through its agents, having apparent authority, of the defense of change of ownership of the property insured.  p. 233

Whether the fact that trustees under a mortgage, at the time of securing a policy of insurance on the property, payable to them as their interest might appear, failed to disclose the fact

that foreclosure proceedings had been instituted, and that the property was in litigation, constituted a concealment of material facts within the meaning of the policy, rendering it void, *held* a question for the jury. p. 234

In an action by the trustees under a mortgage to recover on a policy of insurance made payable to them as their interest may appear, no defense can be based on the insurer's right of subrogation, when such right is valueless by reason of the insufficiency of the mortgagor's property, including that mortgaged, to satisfy the claims of the holders of the mortgage notes, the policy providing that no subrogation should impair the right of the mortgagee (or trustee) to recover the full amount of their claim. pp. 234, 235

In an action on a policy by trustees under a mortgage, a statement made by one of the trustees to a local agency at the time of taking out a policy through that agency in another company, in place of which policy that of defendant company was subsequently issued by the same agency, was admissible to affect defendant with the knowledge imparted by that statement. p. 235

*Decided March 13th, 1926.*

Appeal from the Baltimore City Court (ULMAN, J.).

Action by D. H. Roland Drury and B. Erlie Talbott, as first mortgagees and trustees, against the Royal Insurance Company. From a judgment for plaintiffs, defendant appeals. Reversed.

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*W. Calvin Chesnut,* with whom was *James K. Cullen* on the brief, for the appellant.

*Raymond S. Williams* and *William Stanley,* with whom were *Stanley & Stanley* and *Hershey, Donaldson & Williams,* on the brief, for the appellee.

WALSH, J., delivered the opinion of the Court.

The chief question to be determined in this case is whether or not the final ratification of a sale of property made under a power of sale contained in a deed of trust, to the holders of the notes secured by the deed of trust, effects "any change of ownership" in the property within the meaning of that phrase as used in the "standard mortgage clause," now customarily attached to fire insurance policies covering mortgaged property.

In the fall of 1920 Mr. R. E. Walker, president of the Brightwood Sanitarium Company, after a casual meeting with Mr. D. H. Roland Drury in Washington, D. C., asked him if he could secure a $15,000 loan on a fifty-acre tract of ground and the building thereon, owned by the sanitarium and situated on the Baltimore and Washington Boulevard, about six-tenths of a mile from the main road leading to Laurel. After some discussion, Drury, who had for many years been engaged in the real estate and loan business in Washington, agreed to try to raise the money and Walker agreed to pay him a $7,500 bonus if he obtained it. Drury thereupon investigated the property and on November 17th, 1920, the Sanitarium Company executed a deed of trust conveying the property to Drury and B. Erlie Talbott, the appellees, to secure the payment of ten negotiable promissory notes of varying amounts, totalling $22,500, made payable to Mildred B. Drury, the wife of D. H. Roland Drury, or order, six months after date. These notes were endorsed without recourse by Mrs. Drury, and sold at a discount to the following persons, who still hold them: Thomas B. Harney, Martha G. Harney, Evelyn S. McLachlen, Thomas P. Hickman, John P. Cochran, John H. Drury and Emma Goldman. The actual amount received in cash by D. H. Roland Drury from the purchasers of the notes was $19,365, out of which he retained a commission of $4,375.50 and turned over the balance of $14,989.50, less expenses, to the Maryland Title Insurance Company on December 16th, 1920, with instructions to pay it to the Sanitarium Company when the title

to the property should be found good, and the deed of trust reported to be a first deed of trust of record. Due to difficulties with the title, the deed of trust was not actually recorded until June 3rd, 1921, six and a half months after it was executed in November, 1920. The Sanitarium Company expected to issue $40,000 in bonds, from the proceeds of which the loan obtained from Drury was to be paid, and this Drury loan was wanted for the purpose of enabling the company to complete the purchase of the property and begin building operations pending the issuance and sale of the bonds. Some work was done on the foundation of the proposed new building and a large amount of material was delivered on the ground, but, upon the failure of the company to issue and sell the bonds, the work ceased, the material, which had not been paid for, was taken away by the material men, and the whole project collapsed. In October, 1921, Drury, who had been unable to get possession of the insurance policy which Mr. Walker, president of the company, had told him was in existence, applied to A. H. Baker & Company, an insurance agency in Washington, for a policy on the residence building on the property. This application was made to Mr. Baker over the telephone, and Drury, who sometimes solicited insurance for this agency, and who received a commission on the policies subsequently issued on the risk involved in this case, gave him at that time a description of the property, the name of the owner, and the names of the trustees under the deed of trust. A one-year policy for $10,000 was thereupon issued upon the property by Baker & Company, as agents for the Firemen's Insurance Company of Newark, New Jersey, in which policy the Sanitarium Company was described as owner, and a standard mortgage or trustee clause in favor of Drury and Talbott, Trustees, was attached. At the time this policy was issued no foreclosure proceedings had been instituted under the deed of trust, though the notes were unpaid and overdue. However, on November 18th, 1921, the trustees docketed suit against the Sanitarium Company and advertised the

property for sale under the terms of the deed of trust. Prior to the date set for the sale a preliminary injunction restraining it was obtained at the instance of certain alleged creditors of the company, and the controversy thus begun was not settled until the injunction was dissolved by a decree of this Court, rendered on November 17th, 1922. (See *Kinsey v. Drury,* 141 Md. 684.)

The $10,000 policy expired in October, 1922, and on September 18th, 1922, Baker & Company sent Drury two $5,000 policies covering the property from October 19th, 1922, to October 19th, 1923, in place of the $10,000 policy. One of these $5,000 policies was issued by the same company which issued the $10,000 policy, while the other was issued by the Royal Insurance Company, Limited, an English corporation, the appellant in this case. No additional information was given Baker & Company by Drury at the time these policies were issued, and, like the original $10,000 policy, they were each issued to the Sanitarium Company as owner, with a standard mortgage clause in favor of the appellees attached.

After this Court dissolved the above mentioned injunction, the property was again advertised, and was actually sold on December 22nd, 1922, to the holders of the notes under the deed of trust, for the sum of $15,000, which sum was about $10,000 less than the total amount due for principal, interest and taxes under the deed of trust. Drury and Talbott, the trustees, reported this sale to the Court on December 27th, 1922, setting out in the report that the property had been sold to Thomas R. Harney, Martha G. Harney, Evelyn S. McLachlen, John B. Cochran, Thomas P. Hickman, John H. Drury and Emma Goldman, and also stating that, as these purchasers were the holders of the notes secured by the deed of trust, the trustees had not required them to make the initial payment of $1,500 called for in the advertisement of sale, the trustees "being satisfactorily assured that said purchasers will duly settle for said property upon the ratification of said sale by this Honorable

Court." The report of sale also stated: "Taxes and insurance adjusted to the day of sale." On January 30th, 1923, this sale was finally ratified and confirmed, but no deed for the property has yet been given by the trustees to the purchasers, nor have the purchasers paid anything on the purchase price. The testimony shows that the trustees intended to accept the notes held by the purchasers as part payment on the purchase price, collecting in cash only such sum as would be needed to pay the costs of the case, and it also appears that all the purchasers were solvent and able to pay their full share of the purchase price without regard to the notes held by them.

Shortly after the sale of the property, the same parties who had sought to enjoin the sale had themselves made parties to the foreclosure suit, and filed claims against the proceeds of the sale, but these claims were disallowed in the lower court, and this decision of the lower court was affirmed by this Court on June 1st, 1924. (See *Kinsey v. Drury,* 146 Md. 227.)

On Sunday night, May 20, 1923, nearly four months after the final ratification of the sale of the property, it was totally destroyed by fire of unknown origin. At the time of the fire, the property was occupied by a Mr. Kinsey and his family, who had lived in the house since March, 1921, and who, after the sale of the property, were permitted to remain in it, without paying rent, by Drury and Mr. Clark, the latter being one of the attorneys for the trustees in the foreclosure proceedings. After the fire the Brightwood Sanitarium made no claim for any insurance, nor has it yet made such claim, but Drury reported the loss to Baker & Company, the agents for the companies, and it was referred by the companies to their respective adjusters, Mr. Harry S. Gardner, of Baltimore, representing the appellant, and Rose and Smith of Baltimore, representing the Firemen's Insurance Company of Newark, New Jersey. After about a year of correspondence and other negotiations, the details of which will be adverted to later, Drury and Talbott, as first mort-

gagees and trustees under the deed of trust, entered suit against the Royal Insurance Company to recover on the $5,000 policy issued by that company on September 18, 1922, and the verdict and judgment below being in favor of the trustees and against the insurance company, the latter appealed.   The appeal brings up for review the action of the learned court below in sustaining demurrers to two equitable pleas filed by the appellant after all the testimony had been taken, its ruling on one question of evidence, and its action in refusing the defendant's first, second, third, fourth, fifth, seventh, eighth, ninth and tenth prayers, and in granting the plaintiff's first prayer and an instruction drawn by the court.

. We will first consider the rulings on the prayers.   The Court's instruction was as follows:

> "The court instructs the jury that by the proper construction of the mortgage clause in the policy sued on in favor of Drury and Talbott, Trustees, as interest may appear, the defendant insurance company must be held to have intended to insure and did insure any person or persons who, from time to time might be the holders of any of the notes secured by deed of trust to said trustees, and, therefore, the judicial sale of the property finally ratified January 30, 1923, to the persons who were then the holders of the notes secured by the deed of trust to said trustees was not a change of ownership within the meaning of the mortgage clause annexed to the policy sued on, and the interest of the trustees in the loss or damage by fire to said property still existed at the time of the fire, therefore the plaintiff is not precluded from recovering on said policy by reason only of said final ratification of said judicial sale."

The defendant's second, eighth, ninth and tenth prayers asked the court in various ways to rule that the final ratification of the judicial sale of the property to the note holders effected a change in the ownership of the property, of which the defendant had no notice, and thus rendered the policy

void, and the defendant's third and seventh prayers asked the court to rule as a matter of law that the ratification of the sale extinguished the mortgage or trust interest which the plaintiffs had in the property and hence they could not recover. These six prayers of the defendant and the court's instruction will be considered together, as they all present substantially the same questions, namely, did the ratification of the sale effect "any change of ownership" within the meaning of that phrase as used in the standard mortgage clause attached to the policy sued on in this case, and did it extinguish the interest which the plaintiffs had in the property?

The suit is based on the fire insurance contract, the policy having been filed with the declaration, and this policy, we are advised in the brief, is the standard New York form of 1886 and is not the more recent New York form effective in New York on January 1st, 1918, and, since January 1st, 1924, in general use in Maryland.

It is to be observed that this suit was not brought by the Brightwood Sanitarium Company, the original owner named in the policy. That company apparently made no claim to any right to the insurance money, nor could it have successfully made such a claim. The policy sued on provided, *inter alia*, that it should be void "if the interest of the insured be other than unconditional and sole ownership," or if, "with knowledge of the insured, foreclosure proceedings be commenced or notice given of sale of any property covered by this policy by virtue of any mortgage or trust deed." It is not denied that the appellant had no notice of the foreclosure proceedings, the sale, or its final ratification, prior to the fire, and hence, aside from other possible reasons, the policy was avoided so far as the Sanitarium Company is concerned, by its failure to give notice as required by the policy. *Skinner & Sons Co. v. Houghton,* 92 Md. 68; *Frontier Mtge. Corp. v. Heft,* 146 Md. 1; *Linthicum Heights Co. v. Firemen's Ins. Co.,* 134 Md. 62; *Brewer v. Herbert,* 30 Md. 301.

It accordingly follows that the appellees are not claiming this insurance money by reason of any rights to it received by them from the Sanitarium Company, but are claiming it in their own right by virtue of the provisions of the standard mortgage clause in their favor, attached to the policy, and this is the position of their counsel. This mortgage clause reads as follows:

### "MORTGAGE CLAUSE.

"Loss or damage, if any, under this policy, shall be payable to D. H. Roland Drury and B. Erlie Talbott, as first mortgagee (or trustee), as interest may appear and this insurance, as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to the property nor by any change in the title or ownership of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by this policy; provided, that in case the mortgagor or owner shall neglect to pay any premium due under this policy the mortgagee (or trustee) shall on demand pay the same.

"Provided also, that the mortgagee (or trustee) shall notify this company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of said mortgagee (or trustee) and, unless permitted by this policy, it shall be noted thereon and the mortgagee (or trustee) shall, on demand, pay the premium for such increased hazard for the term of the use thereof; otherwise this policy shall be null and void.

"This company reserves the right to cancel this policy at any time as provided by its terms, but in such case this policy shall continue in force for the benefit only of the mortgagee (or trustee) for ten days after notice to the mortgagee (or trustee) of such cancellation and shall then cease, and this company shall have the right, on like notice, to cancel this agreement. ment.

"Whenever this company shall pay the mortgagee (or trustee) any sum for loss or damage under this policy and shall claim that, as to the mortgagor or owner, no liability therefor existed, this company shall to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made, under all securities held as collateral to the mortgage debt, or may at its option, pay to the mortgagee (or trustee) the whole principal due or to grow due on the mortgage with interest, and shall thereupon receive a full assignment and transfer of the mortgage and all such other securities; but no subrogation shall impair the right of the mortgagee (or trustee) to recover the full amount of their claim.

"Attached to and forming part of Policy No. 413761 of the Royal Insurance Company of Liverpool, England.

"Dated.........................

"A. H. BAKER, Agent."

We will first consider the appellant's contention that the final ratification of the sale of the property to the note holders effected a "change of ownership" within the meaning of that phrase as set out in the mortgage clause just quoted. Whatever the rule may be elsewhere, it has been repeatedly decided and is now definitely established in Maryland that, in equity, "from the time the owner of an estate enters into a binding agreement for its sale he holds the same in trust for the purchaser, and the latter becomes a trustee of the purchase money for the vendor, and being thus, in equity, the owner, the vendee must bear any loss which may happen, and is entitled to any benefit which may accrue to the estate in the interim between the agreement and the conveyance." *Brewer v. Herbert, supra; Skinner & Sons Co. v. Houghton, supra; Swartz v. Realty Co.,* 106 Md. 290; *Linthicum Heights Co. v. Firemen's Ins. Co., supra.* It was also stated in *Brewer v. Herbert, supra,* that: "Where sales are made under authority of a court, the contract is

not regarded as consummated until it has received the court's sanction or ratification, and, therefore, any loss happening before confirmation falls upon the vendor. *Ex parte Minor,* 11 Ves. 559; *Wagner vs. Cohen,* 6 Gill, 102. But where a loss occurs after confirmation, by which the contract is consummated, it falls upon the vendee, even though no purchase money has been paid, and the vendor remains in possession."

In *Hanover Fire Ins. Co. v. Brown,* 77 Md. 64, the Court held that an advertisement of sale under a power contained in a mortgage was practically equivalent, so far as the policy in that case was concerned, to a decree for a sale, and it further held that before the ratification of the sale the loss falls upon the purchaser. And in *Bowdoin and Brown v. Hammond,* 79 Md. 173, 178, 179, the Court said: "Where property is sold under a decree of the court, and a loss occurs before the sale is ratified, the loss falls upon the owner and not upon the purchaser, for the reason that the contract of sale is not a complete sale until it has received the sanction of the court. As we said in *Hanover Fire Insurance Co. v. Brown,* 77 Md. 64, the court in such a case is the vendor acting through its agent, the trustee who has been appointed to make the sale. He reports to the court the offer of the bidder for the property, and if the offer is accepted, the sale is ratified, and, thereupon, and not before, the contract of sale becomes complete." And to the same effect see the recent decision of this Court in *Fine v. Beck,* 140 Md. 317.

In other words, it is the established law of Maryland that the ratification of a judicial sale is the equivalent of a valid contract of sale, and that in both instances equity considers that the beneficial interest and ownership in the property involved is vested in the purchaser, and the purchaser suffers any loss which happens, and receives any benefit which accrues, to the property, between the date of the ratification, or execution, and the final transfer of the legal title.

This brings us to a consideration of the effect which the application of this principle has on recoveries under fire

insurance policies issued to the vendor and covering the
subject-matter of the sale or contract, where the loss occurs
after the ratification of the sale, or the execution of the con-
tract.

In *Skinner & Sons Co. v. Houghton, supra,* the loss oc-
curred after the execution of a binding contract of sale, and
the policy, which had been issued in the name of the vendor,
provided that it would be void "if any change, other than
by the death of an assured, take place in the interest, title
or possession of the subject of insurance" without permission
of the insurer. In holding that the contract of sale effected
"a change in the interest" of the subject of insurance, Judge
Boyd, who delivered the opinion of the Court, said: "Can it
be doubted that there was a change in the *interest* in this
property? As long as the insured has made no change in
his estate in the property, a company may be perfectly satis-
fied to continue the insurance, but if he makes such a change
as to divest himself of all interest in the property, except-
ing a vendor's lien for the purchase-money, and has a respon-
sible party bound for the payment of that, he does not have
the same motive for the protection of the property that he had
before. In short, the insurer's risk is or may be increased
by the change of the interest of the insured. As was said
by Judge Alvey in *Bowman v. Insurance Co.,* 40 Md. 631:
'The great purpose of all such provisions in policies of in-
surance is to enable the insurer to determine the extent of
the risk, and the nature and extent of the interest of the
insured in the premises.'" And later on in the opinion,
after discussing the provision that the policy would be void
"if the interest of the insured be other than sole and uncon-
ditional ownership," and citing a number of cases holding
that the vendee under a valid contract of sale, and not the
vendor, is the owner, and is sometimes considered the "sole
owner," the Court said: "When we remember the manifest
object of such provisions and the explicit language used in
these policies, we cannot escape the conclusion that a sale,
such as was made by Mrs. Houghton, did render the policies

void. It may be that great hardship is sometimes imposed on innocent persons, by reason of such provisions in insurance policies, but that does not justify courts in refusing to enforce contracts, as made by the parties, if lawful. When the provisions are reasonable and tend to prevent incendiarism or carelessness, which may inflict losses upon other persons whose properties are in the vicinity, their language should at least be given its usual and ordinary meaning. When a sale of property is thus made it is a simple matter to obtain the consent of the insurer, if his risk is not materially increased, and if it is so increased why should he be subjected to a hazard that he has not assumed? Until the offer of the Houghtons had been accepted, a different condition existed, but after it was, there was then a binding agreement on the one part to sell and on the other to purchase, and there was hence a change of interest in the subject of insurance."

And in *Linthicum Heights Co. v. Firemen's Ins. Co.,* *supra,* in which a similar decision was made, the Court quoted extensively from the *Houghton* case and re-affirmed and approved the doctrine announced in that case.

In the present case the mortgage clause provides that, to the extent of the interest of the mortgagee (or trustee) only therein, the insurance shall not be invalidated "by any change in the title or ownership of the property * * * provided also that the mortgagee or trustee shall notify this company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of said mortgagee (or trustee) · and unless permitted by this policy it shall be noted thereon; * * * otherwise this policy shall be null and void." It accordingly follows, from the decisions heretofore cited, that, in the absence of a waiver, there can be no recovery in this case unless it can be held that the final ratification of the trustees' sale, though it changed the "interest" of the insured, did not effect "any change of ownership," or unless it can be held that the purchase of the property by the noteholders under the deed of trust in some way prevented there being "any change of ownership."

We are of the opinion that the ratification of the sale did cause some "change of ownership." The word "Ownership" is defined in *Bouvier's Law Dict.,* Vol. 2, page 343, as "The right by which a thing belongs to some one in particular, to the exclusion of all others." In dealing with the words "sole and unconditional ownership" the courts have quite generally held that the phrase contemplates the beneficial and practical proprietorship and does not necessarily include the technical title, and it is also held that "if insured possesses the equitable title to the premises, the fact that the naked legal title is outstanding, which he has a right to compel to be transferred, will not amount to a breach of a condition that he is the owner, that his interest is absolute, or that his title is not other than sole and unconditional ownership," 26 *C. J.* 173, and many cases cited in note 2. We do not think it necessary at this time to decide whether or not this last quotation expresses the law in Maryland. We merely quote it to show that many courts hold that the vesting of the equitable or beneficial interest in property not only causes a "change of ownership," but effects a complete change and renders the equitable owner the "sole and unconditional owner." The same idea is also expressed in the *Houghton* case, *supra,* where Judge Boyd said: "The cases referred to under the first branch of this case, show that the purchaser is the owner, and there are many decisions to the effect that he is within the meaning of such provisions in policies the 'sole owner.'" And in *Brewer v. Herbert, supra,* the Court said: "In contracts of this kind (contracts of sale) between private parties, the vendee is in equity the owner of the estate from the time of the contract of sale."

The policy sued on in this case was issued to and described the Brightwood Sanitarium Company as owner, and prior to the ratification of the trustees' sale it was the owner and had possession of the property. Under the authorities just cited the ratification of the sale vested the equitable owner-

ship of the property in the purchasers. These purchasers held notes in excess of the amount of the sale payable from the proceeds of the sale, so that all that they had to do to complete the transaction was to surrender the notes to the trustees, pay the costs of the case, and obtain a deed for the property, and aside from the notes which they held they were all solvent and actually able to pay their respective shares of the purchase price in cash. In addition to this, Drury and one of his counsel took possession of the property, evidently as agents for the purchasers, and arranged to have Mr. Kinsey and his family, the former tenants, remain in charge of it. The mortgage clause prohibits "any change of ownership" without the knowledge and consent of the insurer. Certainly the proceedings just mentioned constituted *some* "change of ownership" within the meaning of that provision, unless the fact that the property was purchased by the noteholders under the deed of trust in some way prevents such a conclusion. The appellee has cited cases from a number of states in which it was held that where mortgaged property was purchased by, or transferred to, a mortgagee named in and protected by a standard mortgage clause, such transfer or purchase did not effect "any change of ownership," the theory being that since the insurer knew who the mortgagee was, and actually made a contract of insurance with him by attaching a standard mortgage clause to the policy, it must be held to have anticipated that the mortgagee might become the owner of the property, and as the standard mortgage clause protects the mortgagee's interest "as it may appear," the acquisition of the title and ownership of the property is merely an increase of interest, and is not a change of ownership. Such cases are *Dodge v. Hamburg-Bremen Fire Ins. Co.,* 4 Kan. App. 415; *Fort Scott Building Assn. v. Ins. Co.,* 74 Kan. 272; *Washburn Mill Co. v. Fire Assn. of Phila.,* 60 Minn. 68; *Pioneer Savings and Loan Corp. v. St. Paul Fire Ins. Co.,* 68 Minn. 170; *Oregon Mortgage Co., Ltd., v. Hartford Fire Ins. Co.,* 122 Wash. 183; *Southern States Fire, etc., Co. v. Napier,* 22

Ga. App. 368; and *Bragg v. New England Mutual Fire Ins. Co.*, 25 N. H. 289. On the other hand, the appellant cites a number of cases in which the courts have held that the acquisition of title and ownership by a mortgagee does constitute a "change of ownership," but it must be observed that in most, if not all, of these cases, there was no standard mortgage clause attached to the policy, the mortgagee being protected simply by a rider making the loss payable to the "mortgagee as his interest may appear," with no further contractual stipulations. Such cases are: *Boston Co-operative Bank v. American Central Ins. Co.*, 201 Mass. 350; *McKinney v. Western Assur. Co.*, 97 Ky. 474; *Brunswick Savings Institution v. Commercial Union Ins. Co.*, 68 Me. 313; *Hoxsie v. Provident Mutual, etc., Co.*, 6 R. I. 517; *Dailey v. Westchester Fire Ins. Co.*, 131 Mass. 173; *Brecht v. Law Union, etc., Co.*, 160 Fed. 399; and *Hendrix v. National Union Fire Ins. Co. of Pa.*, 205 Ky. 283. And for a general discussion of the cases involving this matter see 23 L. R. A. (N. S.), 1147, note.

However, we do not think it necessary, in deciding the matter now before us, to choose between these two lines of authorities, or to adopt the views expressed by either of them. In the present case the mortgagee (or trustee) clause makes the loss, if any, payable to the trustees, Drury and Talbott, as their interest may appear, whereas the purchasers of the property at the sale were the seven individual noteholders. The report of sale does not state that the trustees bought in the property for or on behalf of the noteholders, but says that the noteholders themselves bought the property and sets out their names as the purchasers. Conceding for the sake of the argument, but not deciding, that there is no "change of ownership" within the meaning of such a policy and mortgage clause as we are considering, where the property is bought in by a mortgagee named in the mortgage clause, it certainly cannot be logically contended that the reasons supporting such a rule apply to a case like the present, in which the purchasers are not in any way named in either the policy or mortgage clause, and where the insur-

ance company did not know until after the loss who they were. It is true that the insurer insured the trustees, and it knew these trustees were holding the property to secure the holders of the notes, but to hold that the company, by insuring the trustees, also insured the noteholders after they purchased the property, would be an unwarranted extension of even the liberal view which holds the company liable where the property is purchased by a named mortgagee, and it is significant to note that counsel have referred us to no case, nor have we found any case, which so holds. In *Dodge v. Hamburg-Bremen Fire Ins. Co., supra,* a case which applied the rule that a purchase of the property by a named mortgagee did not constitute "any change of ownership," the court, in its opinion, stated that "if a stranger is the purchaser, there is a change of ownership," and in the present case we think the noteholders were "strangers" to the insurance contract. At the time the deed of trust was executed the ten notes were all held by Mildred B. Drury. At the time the insurance was taken out, and also when the loss occurred, they were held by the seven persons named as purchasers, but they could just as readily have changed hands a dozen times between the issuance of the policy and the happening of the fire. They passed by endorsement and delivery, and they carried the debt with them without reference to any notice to the trustees or any assignment of the deed of trust. It is entirely possible that the trustees themselves would not know who held the notes from time to time, and while an insurance company might be entirely willing to insure an owner, and make the loss payable to trustees for the benefit of any person or persons who might hold the evidences of the debt against the property, that is quite different from saying that it would be willing to continue this insurance after the creditors, of whom it knew nothing, had purchased and taken possession of the property, as they did in this case. Another point of difference between the present case and one involving a mortgage is found in the fact that in Maryland a mortgage debt passes only by assignment of

the mortgage itself, and does not pass by the transfer of the mortgage notes.   Section 25 of article 66 of the Code.

Now it cannot be questioned that if the holder of a mortgage validly assigned it to some third person, without notifying the insurance company of such assignment, there could be no recovery from the company by either the original holder of the mortgage or by his assignee.   The former could not recover because he would no longer have any insurable interest in the property, and the latter could not recover because he would clearly be a stranger to the insurance contract. Hence, where an insurer is dealing with a mortgage, it is released from liability unless it is at all times advised of who the mortgagee is, but under a deed of trust, such as we are here considering, the debt secured passes by the transfer of the notes, so that to hold the insurer liable to these noteholders after they have purchased the property, regardless of whether or not the insurer ever heard of them before, evidently imposes upon the insurer the assumption of a much greater risk than does the rule holding them liable to a known mortgagee who acquires the complete title to the mortgage property.

It is further to be observed, as pointed out by the learned counsel for the appellant, that if the mortgage doctrine is applied to instruments given to secure debts which pass by transfer of separate evidences of the debt, such as bonds or notes, then an insurer would be liable to the holder of a single hundred dollar bond who purchased a property sold under an instrument securing perhaps a million dollars of bonds. This argument was said to be inapplicable to the present case because here all the noteholders joined in the purchase, but as the insurer did not know any of them, it is difficult to see what difference it would make whether one, all, or any number of them made the purchase.

There are perhaps other reasons which could be adduced against the position contended for by the appellees, but we think sufficient has been said to show conclusively that under the policy and mortgage clause sued on in this case the ratification of the sale to the noteholders constituted a "change

of ownership," and that, as the appellant had no notice of this change and the appellees did, it avoided the policy. It accordingly follows that, in our opinion, the learned court below erred in instructing the jury that "the judicial sale of the property finally ratified January 30th, 1923, to the persons who were then the holders of the notes secured by the deed of trust to said trustees, was not a change of ownership within the meaning of the mortgage clause annexed to the policy sued on." This conclusion will prevent a recovery by the appellees unless the "change of ownership" was waived by the appellant.

The next question to be considered is whether the ratification of the sale entirely extinguished the interest of the appellees in the property. We do not think it did. The appellees still had an interest to the extent of the purchase price, and while this interest was perhaps different in character from their interest as trustees under the deed of trust, it was nevertheless an insurable one. This holding disposes of the contention of the appellant that the appellees had no interest at all and reduces this defense to that of change of interest, and as such a change in interest could, under the authority of the *Houghton* case (92 Md. 92), be waived by the company, the determination of whether there was such a waiver will dispose of it as well as of the defense of "change of ownership."

This question of waiver is raised by the action of the court below in refusing to grant the second, eighth and ninth prayers of the defendant asking for a directed verdict on the ground that the change of ownership avoided the policy. If there was no waiver these prayers should have been granted, while if there was a waiver no error was committed in refusing to grant them.

The following principles regarding waiver in insurance cases would now seem to be firmly established. The rule is well settled that when the insurer, with knowledge of all the facts constituting a breach of a condition or warranty, requires the insured, by virtue of the policy, to do some act or incur some trouble or expense, the forfeiture is deemed to

have been waived. 26 *C. J.* 283, 335; *Tinsley v. Aetna Ins.
Co. etc.,* 199 Mo. App. 693; *Maxwell v. Dirigo Mut. Fire
Ins. Co.,* 117 Me. 431; *Hanscom v. Home Ins. Co.,* 90 Me.
333; *McNally v. Phoenix Ins. Co.,* 137 N. Y. 389; *Western
Ins. Co. v. Ashby,* 53 Ind. App. 518; *Veenstra v. Farmers'
Mut. Fire Ins. Co.,* 195 Mich. 55; 14 R. C. L., sec. 376, p.
1197; note in 9 L. R. A. 318; *Replogle v. American Ins. Co.,*
132 Ind. 360; *Pelroff v. Equity Fire Ins. Co.,* 183 Iowa,
906; *Georgia Home Ins. Co. v. Goode & Co.,* 95 Va. 751;
*Pennsylvania Fire Ins. Co. v. Kittle,* 39 Mich. 51; *Dick v.
Equitable Fire Ins. Co.,* 92 Wis. 46; *Home Fire Ins. Co.
v. Phelps,* 51 Neb. 623.

"An insurer may waive any condition or provision in-
serted in the policy for his benefit. Particular matters which
may be waived by the insurer include * * * requirements and
warranties as to sole and unconditional ownership and change
of ownership." 26 *C. J.* 281, and cases cited in note 51.

And such requirements and warranties may be waived by
acts and conduct of the insurer himself, or of his agent, hav-
ing real or apparent authority, provided such acts or con-
duct occur after the insurer or his agent has full knowledge
of the facts giving rise to the breach. *Hartford Fire Ins.
Co. v. Keating,* 86 Md. 130, 149; 26 C. J. 287. And it is
also established that "the question of waiver in any case must
depend upon the facts and circumstances of that case." *Bak-
haus v. Caledonian Ins. Co.,* 112 Md. 676, 685.

In the present case there is testimony tending to show that
the appellant through its adjuster, Mr. Gardner, its policy
writing agent, Baker & Company, and its special agent,
Mr. Poe, carried on negotiations with the appellees and their
counsel concerning this loss for approximately a year, and
during this time the appellant never denied liability under
the policy. These negotiations began on May 23rd, 1923,
with a letter from Gardner to Drury stating that he was ad-
juster for the appellant and "would be glad to receive * * *
an estimate in detail showing replacement cost of building,"
and a diagram showing the arrangement of the house by
floors and rooms," and also requesting information about the

ownership during the three years preceding the loss. On May 25th, 1923, Drury answered this letter giving much of the information requested, and later on an estimate of the cost of reconstruction was sent by him to Gardner. On June 1st, 1923, Gardner wrote Mr. Clark, the attorney for the appellees, requesting more specific information about the sale, though rather complete information about this was given in Drury's letter of May 25th. On June 8th, Gardner again wrote Clark requesting an answer to his letter of June 1st by return mail, and on June 16th, 1923, Clark wrote him, giving full details of the sale. On July 19th, 1923, Drury filed "proof of loss" with Baker & Company, and on August 14th, 1923, Gardner wrote Drury about this "proof of loss," stating it was rejected and pointing out various defects in it. This letter concluded with a statement that the company waived none of its rights, and neither admitted nor denied liability "at the present time," and it is insisted that this protected the appellant, but we believe the better authorities hold that such a statement will not prevent the operation of a waiver. 26 *C. J.* 336-337. Later, on October 14th, 1923, a meeting was held between Drury, his attorneys, Clark & Stanley, Mr. Smith of Rose & Smith, adjusters for the Firemen's Insurance Company of Newark, N. J., and Gardner, and, though the testimony is conflicting, there is certainly some evidence showing that Gardner at this time requested additional proof of loss, and stated that the appellant had not paid the money because it did not know to whom to pay it, "that certain judgment creditors out there had filed claims against this property, and that the matter was in the hands of the court, and he (Gardner) wanted that matter straightened out." See *Kinsey v. Drury,* 146 Md. 227. Still later, supplemental proof of loss, including a blue print or diagram of the property, and another estimate of the cost of reproduction, secured by Drury at some expense, was furnished. There was further testimony showing telephone calls and other negotiations about this loss, and it also appeared that Drury made a trip to the home office in New York about it, and was there told by Mr. Woodman, the loss

superintendent of the appellant, that the matter had been referred to Mr. Poe, and there was testimony that Poe had placed the matter in Gardner's hands. It should also be noted that there is a question whether the trustees in this case could be required to furnish any proof of loss, the policy seeming to require the owner to do this, and if they could not, then the actions of the appellant's agents were all the more misleading. See *Granger v. Manchester Fire Assur. Co.,* 119 Mich. 177.

Without going into further detail, it suffices to say that, in our opinion, the testimony of the appellees, if believed by the jury, was sufficient to show that the appellant waived the defense of "change of ownership," and we also think there was sufficient in the case to support a finding that, under all the circumstances, the agents of the appellant with whom the appellees dealt, namely Baker and Company, Gardner, Poe and Woodman, had the apparent authority to waive this defense. Nor do we think the provisions in the policy regarding the inability of agents to waive any of its provisions prevent a recovery by the appellees in this case. *Bakhaus v. Caledonian Ins. Co., supra; Goebel v. German Amer. Ins. Co. of Pa.,* 127 Md. 419; *Rokes v. Amazon Ins. Co.,* 51 Md. 512; *Roberts v. Sun Mutual Ins. Co.,* 13 Tex. Civ. App. 64; *Continental Ins. Co. v. Reynolds,* 107 Md. 96.

It follows that the question of waiver should have been submitted to the jury under appropriate instructions from the court, and there was accordingly no error in rejecting the second, eighth and ninth prayers of the defendant, nor in rejecting its first, third, seventh and tenth prayers, all of which asked for a directed verdict in its favor. We are aware that this whole doctrine of waiver in insurance law has been severely criticised, but in view of the overwhelming weight of authority which supports it we are not prepared to repudiate it. It seems to rest on the theory that courts do not wish to encourage technical defenses by insurance companies, and that to avoid technical forfeitures they have established the rule that slight acts by insurance companies will constitute a waiver of such defenses. Whatever may be

said for the logic of this position, it is undoubtedly supported, as we said above, by the great weight of American authority, and would now seem to be firmly established as the law of this country.

The appellant further insists, however, that the failure of the appellees to disclose the fact that foreclosure proceedings had been instituted and that the property was in litigation at the time the policy was issued constituted a concealment of material facts, within the meaning of the policy, and so rendered it void. This question was submitted to the jury at the trial below by the defendant's sixth prayer, and, as we consider the question a proper one for the jury under the facts of this case, and the instruction given a proper statement of the law application to it, there was no error in granting the prayer, nor in refusing the defendant's fourth prayer, which asked for a directed verdict on the ground of concealment.

Nor do we find any error in the action of the learned court below in sustaining the demurrers filed by the appellees to the two equitable pleas of the appellant. Counsel for the appellant apparently conceded the correctness of this ruling so far as the second plea is concerned, so we will not consider that plea further. In the first equitable plea the appellant contended that the transfer of the property to the noteholders either destroyed the right of subrogation given the insurer by the mortgage clause, and so avoided the policy, or gave it the right to be subrogated to the rights of the plaintiffs to the purchase price of the property, and as this purchase price exceeded the amount of the insurance it would prevent circuity of action simply to allow no recovery in the present case. In the view which we take of the matter the subrogation rights in this case were of no value. The entire property subject to the mortgage was sold before the fire for $10,000 less than the mortgage debt and accrued interest and taxes, so that, even if the appellees eventually recover the entire amount of the fire insurance, there will still be a deficit. And as the mortgagor is insolvent and there is no suggestion of fraud or collusion so far as the sale itself is concerned,

there would be nothing for the insurer to recover. The policy itself provides, that "no subrogation shall impair the right of the mortgagee (or trustee) to recover the full amount of their claim," and as the holders of the notes are themselves unable to recover all that the owner owes them because its property is exhausted, there is quite evidently nothing that the insurer could get by subrogation.

The final question concerns the admissibility of Drury's statement that when he applied for the first policy of insurance, a year before the policy in this suit was issued, he advised Baker & Company that he "was trustee representing the noteholders and would like to have the insurance placed to protect us." We think this was admissible. It was made to the agents who later issued the policy of the appellant, and this policy was issued as a renewal of part of the first policy without further request from the trustees. Under these circumstances we think the information given Baker & Company when the first policy was issued was binding on the appellant when its policy was issued.

For the reasons heretofore given, the judgment appealed from will be reversed and a new trial awarded.

> *Judgment reversed and new trial awarded, the costs in this Court to be paid by the appellees, and the costs below to abide the event.*