**AMERICAN AUTOMOBILE INSURANCE COMPANY, a body corporate**

v.

**MASTER BUILDING SUPPLY AND LUMBER COMPANY, a body corporate, William Murphy, Jr., Esther Bernstein, and Samuel Bernstein.**

Civ. No. 11063.

United States District Court
D. Maryland.
Dec. 23, 1959.

Frederick J. Green, Jr., Baltimore, Md., for plaintiff.

Sol C. Berenholtz and Charles B. Heyman, Baltimore, Md., for Master Building Supply and Lumber Co.

William Murphy, Jr., and W. Hamilton Whiteford and Jacob A. Gross, Baltimore, Md., for Esther Bernstein and Samuel Bernstein.

THOMSEN, Chief Judge.

In this action for a declaratory judgment the issues are:

1. Whether the "loading and unloading" provisions of an automobile liability policy issued by plaintiff (insurer) to defendant Master Building Supply and Lumber Co. (Master) covered the injuries alleged to have been sustained by defendant Esther Bernstein when some sheetrock, delivered by Master to the Bernstein home, fell and injured her.

2. Whether the "premises-operations" division of a general liability

policy issued by insurer to Master covered the alleged accident.

3. Whether insurer has waived or is estopped to raise the defense of non-coverage.

### Facts

Master sells lumber, lumber products and building supplies from offices, warehouses and a storage yard at 3100 Cold Spring Lane, Baltimore, Maryland. It uses its trucks to deliver materials to building sites, houses and other buildings; its employees ordinarily leave the material wherever the customer tells them to leave it.

Two policies issued by insurer to Master were in force on June 25, 1958, the date of the accident:

1. An automobile policy, which covered liability for bodily injuries "caused by accident and arising out of the ownership, maintenance, or use of the automobile" and provided that "use of the automobile for the purposes stated includes the loading and unloading thereof." The purpose stated was commercial, and the truck which delivered the sheetrock to the Bernstein home was one of the trucks covered by the policy.

2. A general liability policy, which described in four "divisions" various "hazards" for which coverage might be obtained. The policy issued to Master, however, afforded coverage only for the hazard described as "Division 1. Premises—Operations. The ownership, maintenance or use of premises, and all operations." On the "Declarations" sheet of the policy, in the box headed "Division 1. Premises—Operations", insurer's agent had typed:

"3100 W. Coldspring Lane, Balto., Md. *And Elsewhere In The State Of Md.* Building Material Dealers —No Second-Hand Materials—Including Local Managers".

An exclusion provided: "This policy does not apply: (a) under division 1 of the Definition of Hazards, * * * to the ownership, maintenance, operation, use, loading or unloading of * * * (2) automobiles if the accident occurs away from such premises or the ways immediately adjoining * * *."

Master purchased no coverage for the hazards defined as "Division 2—Elevators" or "Division 3—Independent Contractors" or "Division 4—Products".[1]

On June 23, 1958, Mrs. Bernstein and Peter Gordon, a carpenter who was working at the Bernstein home, went to Master's office and ordered some merchandise, including nails, lumber and nine pieces of sheetrock, to be delivered to her house. On the morning of June 25 defendant Murphy, an employee of Mas-

---

1. The "products" hazard was defined as follows:

"(1) Goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such accident occurs away from premises owned, rented or controlled by the named insured or on premises for which the classification stated in division 1 of item 3 of the declarations excludes any part of the foregoing; provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold;

"(2) operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be 'operations' within the meaning of this paragraph: (a) pick-up or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the insured, (c) the existence of tools, uninstalled equipment and abandoned or unused materials and (d) operations for which the classification stated in division 1 of item 3 of the declarations specifically includes completed operations.

ter, using a truck covered by the automobile policy, drove the material from Cold Spring Lane to the Bernstein home, a mile away, and parked the truck in the alley behind the house. He was told by Gordon to leave the nails and lumber in the yard, and by Mrs. Bernstein to bring the sheetrock into the cellar. Murphy lifted the first sheet from the truck, carried it into the cellar, and set it down with one edge on the cement floor and one edge leaning against the storage closet. He did not set it down or rest it from the time he removed it from the truck until he placed it in the basement. He followed this procedure with each piece of sheetrock. After the last piece was placed in the cellar Murphy obtained a receipt from Mrs. Bernstein, was paid by her, and left in the truck.

About four hours later, while Mrs. Bernstein was standing near the sheetrock, it fell upon her and injured her leg. There is no evidence in this case that the sheetrock had been touched by anyone in the meantime.

The same day, June 25, Mr. Bernstein notified Master of the accident, and a few days later the Bernsteins' lawyer wrote Master a letter making claim. On July 3 Master forwarded this letter to insurer's agent, who in turn notified insurer's claim office; they investigated the accident, took statements from Murphy and Master's president, and on July 17 got in touch with the Bernsteins' attorney.

On August 18 the Bernsteins sued Master and Murphy for damages in the Superior Court of Baltimore City, alleging the purchase of the sheetrock, its delivery to their home, that the stacking of the sheetrock was done in a negligent manner, that the sheetrock was left in an unstable and unsafe position, and that while Mrs. Bernstein was in the basement of her home and "in the act of passing this stack of sheet rock * * * because of its negligent and unsafe stack-

ing, the sheet rock toppled and fell upon" her, breaking her legs and otherwise injuring her.

Copies of the declaration and writ of summons were served on Master and Murphy, requiring them to answer the action no later than September 16. On or about August 28 those papers were delivered to insurer for defense under the automobile policy.[2] On September 9 insurer's counsel wrote Master and Murphy that insurer "feels that this occurrence is not within the coverage afforded you by the aforementioned policy of insurance, but it is willing, nonetheless, to defend this suit on your behalf if you will, prior to Noon, Monday, September 15, 1958, return to me the enclosed Agreement properly executed by both of you." The agreement, a non-waiver agreement, was promptly executed. It provided that the defense and further investigation of the Bernsteins' action should be without prejudice to any right insurer might have to disclaim liability or coverage under the policy, and that either party might file an action for a declaratory judgment at any time.

In their letter returning the executed non-waiver agreement on October 13, counsel for Master and Murphy called attention to the general liability policy and stated that the execution of the agreement was without prejudice to such coverage as Master is entitled to under that policy in connection with the accident. This letter crossed a letter from insurer denying coverage under the general liability policy.

Thereafter, insurer's counsel entered his appearance for Master and Murphy in the Bernsteins' suit, which has not yet come to trial.

On December 3, 1958, insurer wrote Master and Murphy denying coverage under the automobile policy, and on December 10, filed the instant action for declaratory judgment in this court. On December 20, Master wrote insurer

2. The automobile policy would protect both Master and Murphy. The general liability policy would not protect Murphy and would protect Master in a smaller amount than the automobile policy.

claiming coverage under both policies, stating that the declaratory judgment is premature, and expressing its desire that insurer's counsel continue to defend the Bernstein suit.

### Discussion

■ **1.** The automobile policy provides coverage for injuries caused by accident and arising out of the use of certain vehicles, or by extension, arising out of the loading or unloading of those vehicles. The policy contains no definition of "loading and unloading", and no Maryland decision construing those words has been cited or found. The decisions in other states are well summarized in Raffel v. Travelers Indemnity Co., 141 Conn. 389, 106 A.2d 716, 718, as follows:

"Two doctrines have been evolved concerning the construction to be given to the phrases 'arising out of the * * * use' and ' "loading and unloading" '. (citing cases) By the more narrow construction, referred to as the 'coming to rest' doctrine, 'unloading' has been held to embrace only the operation of taking the goods from the vehicle to a place of rest out of the vehicle. Only that which occurs in this initial process is covered. (citing cases)

"The majority of the courts have adopted a broader construction and have held that the phrases in question comprehend not only the immediate transfer of the goods from the truck but also the operation of moving them from the vehicle to the place where they are to be ultimately delivered. This is referred to as the 'complete operation' doctrine. Any occurrence during, or arising out of, this process is covered. (citing cases) The rationale of the 'complete operation' doctrine, which we hold is the more just and understandable of the two, is that the

facts of each case must establish a causal relationship between the 'use' and 'unloading' of the vehicle and the injuries inflicted."

I agree with the conclusion stated in the last sentence quoted above, and believe that the "complete operation" rule would be applied by the Maryland courts in such a case as this.

Insurer contends, however, that even if the "complete operation" doctrine be adopted, the automobile policy would afford no coverage in this case because the accident did not occur during the unloading operation, but several hours after the truck had left the scene. Insurer relies particularly on Liberty Mutual Ins. Co. v. Hartford Acc. & Ind. Co., 7 Cir., 251 F.2d 761, where the accident occurred 29 hours after the unloading operation had been completed. The decision of the Seventh Circuit was controlled by an Illinois Appellate Court opinion, which although adopting the complete operation rule as against the coming to rest rule, apparently limited its application to accidents which occur during the operation. The Seventh Circuit felt that the Illinois courts would not hold that the policy covered an accident which occurred after the delivery had been completed, and declined to extend the rule. The key words "arising out of" were not discussed.[3]

On the other hand, a number of courts have noted that the words "arising out of" are broad, general and comprehensive, effecting broad coverage; e. g. Schmidt v. Utilities Ins. Co., 353 Mo. 213, 218, 182 S.W.2d 181, 183, 154 A.L.R. 1088, and Red Ball Motor Freight v. Employers Mut. Lia. Ins. Co., 5 Cir., 189 F. 2d 374, 378. The Schmidt case was followed in Maryland Casualty Co. v. Dalton Coal & Material Co., D.C.W.D.Mo., 81 F.Supp. 895, affirmed as modified, 8 Cir., 184 F.2d 181.

Workmen's compensation cases have taught us that the words "arising out

---

**3.** Insurer also cited American Casualty Co. v. Fisher, 1942, 195 Ga. 136, 23 S.E. 2d 395, 144 A.L.R. 533, and General Accident Fire & Life Assur. Corp. v. Jar-

muth, 1956, 150 N.Y.S.2d 836, but those opinions are not directly in point and are less persuasive than the opinions placing the principal emphasis on causation.

of" have a very different meaning from the words "in the course of". In re McNicol's Case, 215 Mass. 497, 102 N.E. 697, L.R.A.1916A, 306; Weston-Dodson Co. v. Carl, 156 Md. 535, 537, 144 A. 708. If the draftsman of the policy had intended to limit the coverage to accidents which occur in the course of the unloading, he could easily have done so.

The Raffel case, quoted at length above, is directly in point. The Connecticut court noted that it was certainly within the contemplation of the insurer and the insured that the truck would be used for commercial purposes in connection with the insured store, and that in the normal course of making deliveries, the merchandise delivered was customarily placed where the purchaser could most conveniently get it and use it. The court said: "It is reasonable to assume that the operation of unloading did not end until the linoleum was placed where it could be used by its purchaser. If the driver, in carrying forward this mission, was negligent in leaving it where it could, and did, cause injury, that negligent act was a part of the operation of unloading the truck and had a direct causal relation with the truck and the unloading operation. Such an interpretation of the contract requires no strained construction and does no violence to the fair meaning of the terms used."

Insurer calls attention to the fact that in Raffel the linoleum was to be delivered, a portion used and the rest picked up by the insured and returned to the store. That, however, is not an important distinction; the unloading operation had been completed.

■ The Maryland rule, like the Connecticut rule, is that where the terms of an insurance policy are unambiguous they are to be accorded their natural and ordinary meaning, but where the terms are ambiguous they are to be construed most favorably to the insured. New England Mutual Life Ins. Co. v. Hurst, 174 Md. 596, 603, 199 A. 822.

■ Of course, the facts of the case must establish a causal relationship between the use and unloading of the vehicle and the injuries inflicted. Raffel v. Travelers Indemnity Co., supra; Lumbermens Mutual Casualty Co. v. Employer's Lia. Assurance Corp., 1 Cir., 252 F. 2d 463. The Bernsteins may not be able to prove, in their State court suit, that any negligence on the part of Murphy in delivering the sheetrock was a proximate cause of her injury; but if they do prove that the injury was caused by the manner in which the sheetrock was set up in the basement, such proof will satisfy the causation requirement, and insurer will be obligated to pay the damages awarded up to the limits of its automobile policy. In the meantime, insurer is obligated to defend the State court action.

■ Since any such liability will arise out of the unloading of the vehicle away from Master's premises, it is specifically excluded from the coverage of "Division 1" of the general liability policy. This decision makes it unnecessary to decide whether the injury would be covered by Division 1 of that policy if it were held that the accident was caused by the delivery operation but did not arise out of the unloading of the truck.

■■ Master and Murphy argue that insurer has "waived its right to deny liability and/or is estopped therefrom" by its "undertaking to investigate the matter, its assumption of the handling of the matter, its failure to promptly notify Master or Murphy that it questioned or intended to deny liability under said policies and by its other acts and conduct." This argument is without merit. Under Maryland law an insurer may waive forfeitures arising ·from some breach of condition. Royal Ins. Co. v. Drury, 150 Md. 211, 132 A. 635, 45 A.L. R. 582; Manufacturers Casualty Ins. Co. v. Roach, D.C.D.Md., 25 F.Supp. 852. But here, as in Bower & Kaufman v. Bothwell, 152 Md. 392, 136 A. 892, 52 A.L.R. 158, "it is not a forfeiture that is to be found waived, not a violation of

a condition or any irregularity; it is an inapplicability of the policy, so that the waiver argued for would be, in effect, an extension of the contract beyond its defined limits, or a new contract. Such an extension would, at least, we think, require an estoppel, if not a new consideration, to support it." 152 Md. at page 397, 136 A. at page 894.

In the later case of Prudential Ins. Co. of America v. Brookman, 167 Md. 616, 175 A. 838, after quoting from the Bower & Kaufman case, as above, the Maryland Court said: "And it is doubted whether an estoppel, strictly speaking, could suffice to create a new contract. 'We readily agree with counsel for appellant that if the loss was not within the coverage of the policy contract, it cannot be brought within that coverage by invoking the principle of waiver or estoppel. Waiver or estoppel can only have a field of operation when the subject-matter is within the terms of the contract.' Home Ins. Co. of New York v. Campbell Motor Co., (1933) 227 Ala. 499, 150 So. 486, 489. 'In other words, by invoking the doctrine of estoppel and waiver it is sought to bring into existence a contract not made by the parties, to create a liability contrary to the express provisions of the contract the parties did make.' Ruddock v. Detroit Life Ins. Co., 209 Mich. 638, at page 654, 177 N.W. 242, 248. (citing other cases) Whatever the description of the process, it must include the ordinary essentials of a contract, and among them, a meeting of the minds of the parties on the new undertaking, in this instance an undertaking to insure against disability occurring after the age of sixty as well as before it, if the insured should prove to be so old. And the evidence is not sufficient to show that the parties contemplated that undertaking." 167 Md. at pages 620–621, 175 A. at page 840.

In the instant case there was no new contract, no change of position by Master or Murphy and no other facts amounting to an estoppel. Non-waiver agreements are recognized and used extensively in Maryland, to the benefit of all concerned. Hardware Mutual Casualty Co. v. Mitnick, 180 Md. 604, 26 A.2d 393.

Counsel will prepare an appropriate judgment order giving effect to the conclusions set out above.