## ST. PAUL FIRE AND MARINE INSURANCE COMPANY *v.* CHARLES J. MOLLOY

ET UX.

[No. 116, September Term, 1980.]

*Decided August 26, 1981.*

*Motion for reconsideration filed September 8, 1981; denied September 11, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Gary A. Godard,* with whom were *Stephen L. Altman, Roy L. Mason* and *Donahue, Ehrmantraut & Montedonico* on the brief, for appellant.

*Terrell N. Roberts, III,* for appellees.

*Amicus curiae* brief of American Insurance Association filed, *John H. Mudd, Thomas Waxter, Jr., Alan N. Gamse, Daniel J. Moore* and *Semmes, Bowen & Semmes* on the brief.

Digges, J., delivered the opinion of the Court.

Petitioner St. Paul Fire and Marine Insurance Company raises divers issues emanating from the trial which culminated in a final judgment, entered in favor of respondents Charles and Diane Molloy, awarding benefits found to be due them under a homeowner's insurance policy for damage suffered and expenses incurred as a result of a fire in the Molloy abode on January 22, 1978.[1] Although we agree with the trial court's ruling that, even if the allegation of Mr. Molloy's pyromania is proven to be true, the co-insured spouse may be indemnified for her share of the loss, we determine the circuit court erred in holding that St. Paul is precluded, by reason of waiver, from proving Charles Molloy intentionally set the fire, and therefore erroneously removed from jury consideration the petitioner's defense of arson as to the husband's claim.

We now relate sufficient facts to give the reader the flavor of the extensive record in this case which is, to say the least, piquant. Charles Molloy was the only person present in the Bowie, Maryland home, owned by him together with his wife as tenants by the entireties, on the afternoon and evening of January 22nd. According to Charles' testimony below, the fire was started when the ember of his cigarette was dislodged, unknown to him, when he hung up a jacket upon returning home from a grocery store. As the fire smoldered in a pile of clothes on the floor of the closet onto which the ash dropped, Charles dozed off to sleep in front of the television. Late that afternoon, his story goes, the husband awoke to the sound of the family dog barking and a house full of smoke. His examination revealed open flames in the hallway, and, being unable to locate the telephone in the kitchen for the smoke, Mr. Molloy grabbed the dog and some clothes from elsewhere in the house, threw them into his automobile parked in the garage, gathered additional clothes piled on a ping-pong table near the vehicle, and

---

**1.** The record indicates that the respondents had experienced some marital discord in the past, and in fact, Charles and Diane lived apart for several months in the year preceding the fire.

backed his auto out into the driveway, pausing to close the garage door behind him. Mr. Molloy then drove down the street on which his house was situated, passing a number of his neighbors' homes without stopping, and proceeded a total distance of four and one-half miles, again passing several business establishments at which a phone could have been utilized, to a McDonalds Restaurant from which he notified the fire department. Charles returned to his residence some time later to discover that the fire had been brought under control. There, he talked briefly with the fire chief, who informed him that investigators would want to speak to him when they arrived. Mr. Molloy, however, wanted to find his wife, and departed for the home of his mother-in-law where he believed he would find her along with the couple's children. Upon his arrival there a few minutes later, he stopped his automobile in the street, and blew the horn for ten or fifteen minutes, eventually provoking his in-law, with whom he was by his own description "on very poor terms," to emerge from the house and to shout something from the driveway not audible to Charles. Apparently concluding from this unorthodox interaction that his wife was not there, he departed and eventually returned to his own residence at approximately 10:30 p.m., where, upon pulling up to the driveway, he observed his wife and Dewey Meadows, a long-time family friend, standing in the yard along with a large crowd of onlookers. Diane Molloy, together with the children, had spent the afternoon in a hotel five miles from the residence, and had been earlier alerted to the fire by a neighbor. Charles testified he was jealous of Dewey Meadows because Diane "confided in him on some things," though he conceded that he had no reason to believe they had dated or were having an affair. According to Charles' testimony, the sight of Diane and Mr. Meadows together rendered him, at once, infuriated, disoriented and depressed, causing him to drive away at a normal rate of speed. Fire Investigator Robert Edwards' account differed from that of Charles on this point, however, for his testimony reveals that when he and an assistant identified themselves to this respondent while he was seated in his car, Charles rolled up

the window and sped off. The investigators pursued the respondent for some distance in their vehicles, and then abandoned the chase. It seems that Mr. Molloy headed back to his mother-in-law's house, for police officer Freeman Kidwell testified that he approached Charles at around 10:45 p.m. in relation to a disorderly conduct complaint made by the mother-in-law. Mr. Molloy responded to a request for identification by "yell[ing] a couple of obscenities ... and driv[ing] off." Not surprisingly, this conduct gave rise to another chase, this one at high speeds, in which Charles apparently successfully ran two roadblocks, almost struck a police officer, and attempted to run several police vehicles off the road. Mr. Molloy was eventually apprehended, and the charge of arson of which he was later accused was *nol prossed* by the state's attorney.

The Molloys thereafter made a claim for benefits under the fire insurance policy issued by St. Paul, and submitted proof of loss, an inventory of damaged items and estimates for the substantial work needed to refurbish the house. Petitioner, through its counsel, however, informed the insureds by letter that it was

> not liable for this loss of January 22, 1978, by reason of the neglect of the insured to use all reasonable means to save and preserve the property at and after the loss. (See lines 11 through 22 of the 165 line standard fire policy.) The insurance company, of course, reserves its right to invoke any other terms, conditions, or exclusions of the policy which may be applicable to this loss upon facts now known or which may later be discovered. [parenthetical in original.[2]]

The declination of liability resulted in the institution of this litigation by the respondents in the Circuit Court for Prince George's County to enforce payment under the insurance

---

2. During discovery, St. Paul relied on this same non-preservation clause of the policy in response to an interrogatory to "state the specific terms, conditions and/or exclusions of the policy to support your contention that you are not liable to either plaintiff. . . ."

contract. The matter was called for a jury trial on November 27, 1979, at which time, the respondents made a motion *in limine* to exclude any evidence tending to prove that either Mr. or Mrs. Molloy intentionally set the fire. In addition, the wife moved for summary judgment, urging that the only question as to her right to proceeds under the insurance policy was a legal issue: Whether a person, who holds property jointly as a tenant by the entirety, is chargeable with the improper conduct of the other spouse, so that the act of burning by the guilty insured would bar recovery under the policy by the innocent co-insured? Both motions were denied. At the close of the evidence, however, the trial judge effectively modified these rulings — the first by instructing the jury that the defense of arson had as a matter of law been waived and that therefore the panel should disregard any evidence of an intentional burning, and the second, by informing the jury that it was to treat Mr. and Mrs. Molloy, and their interests in the property, separately, so that the wife would not necessarily be barred from recovering for her share of the benefits by the arson of her husband. With the issues limited by these instructions, the jury returned a verdict in favor of the respondents for $87,614.28, and upon the entry of final judgment, St. Paul noted an appeal to the Court of Special Appeals. That court affirmed the circuit court's judgment, *St. Paul Fire & Marine Insurance Co. v. Molloy,* 46 Md. App. 570, 420 A.2d 994 (1980), and we granted certiorari.

Petitioner St. Paul initially argues that the trial court erred in determining the insurance company waived its arson defense, and therefore improperly removed from jury consideration the evidence indicative of an intentional burning. So that Charles Molloy's waiver argument as well as our disposition of it may be fully comprehended, we believe it helpful to set out a few general principles, the correctness of which is not disputed by either party before this Court. The law of this State is in alignment with its counterparts existing in most if not all other jurisdictions, that, in regard to at least certain types of insurance policy provisions, "the right of an insurer to forfeit or void the

policy may be lost by the doctrine of waiver or estoppel." *Rubenstein v. Jefferson Nat'l Life,* 268 Md. 388, 392, 302 A.2d 49, 52 (1973). We have defined waiver as used in this context to be "the intentional relinquishment of a known right" existing for the benefit of the insurer, *see Rubenstein v. Jefferson Nat'l Life, supra* at 392-93, 302 A.2d at 52; *Royal Insur. Co. v. Drury,* 150 Md. 211, 230-31, 132 A. 635, 643 (1926). Equally well established is the fact that such a waiver need not be by express agreement, as it may also "be inferred from the acts and conduct of the company if those acts and that conduct are inconsistent with an intention to insist upon a strict performance of the condition." *The Spring Garden Insurance Co. v. Whayland,* 103 Md. 699, 701, 64 A. 925, 926 (1906); *see also Rubenstein, supra; Food Fair v. Blumberg,* 234 Md. 521, 531, 200 A.2d 166, 172 (1964); *Eastover Stores, Inc. v. Minnix,* 219 Md. 658, 672, 150 A.2d 884, 891-92 (1959). Moreover, we have indicated that conduct in the form of consistent reliance by an insurer on one condition or defense may have the effect of constituting a waiver of other possible known forfeitures. *See Eastover Stores, Inc. v. Minnix, supra* at 672, 150 A.2d at 891-92; *Foard v. Snider,* 205 Md. 435, 447-51, 109 A.2d 101, 106 (1954); *Md. Casualty Co. v. E. Balto. Driv. Assn.,* 135 Md. 105, 112-13, 108 A. 517, 520-21 (1919). Whether waiver exists in a given case is normally a question for the trier of fact, for the determination of its existence *vel non* turns on the intent of the party ostensibly waiving the right, a state of mind which is to be derived from the facts and circumstances surrounding the purported relinquishment. *See Rubenstein v. Jefferson Nat'l Life, supra,* 268 Md. at 395, 302 A.2d at 53; *Fidelity & Casualty Co. v. Riley,* 168 Md. 430, 438-39, 178 A. 250, 254 (1935); *Continental Ins. Co. v. Burns,* 144 Md. 429, 436-38, 125 A. 232, 234-35 (1924).

Charles grounds his waiver argument solely on the legal effect of St. Paul's reliance, both in the letter denying liability and the answer to the interrogatory, on the husband's alleged breach of his contractual duty to save and preserve the property as a justification for its failure to pay. As the argument goes, since "[g]ood faith demands of an insurance

company frank and open dealing with its policy holder," *Spring Garden Insurance Co. v. Whayland, supra,* 103 Md. at 701, 64 A. at 926, St. Paul, by basing its declination of liability on one ground while possessing knowledge of facts giving rise to another, waived the uncommunicated defense. *See* 16C Appleman, *Insurance Law and Practice* § 9260 (1981). We do not agree.

It is unnecessary to delve deeply into waiver resulting from the failure of the insurer to promptly inform the insured of a known ground of forfeiture, for in our view, the non-preservation clause of the policy, identified by St. Paul to justify its position, encompasses the arson defense. The fire insurance policy involved in this case contains no specific exclusion for a burning caused by the intentional act of the insureds, and one express policy provision which incorporates a forfeiture of coverage for damage caused by arson is, in fact, the non-preservation clause paraphrased in the declination of liability letter, and cited in the answer to the interrogatory.[3] We are not the first to recognize that an intentional act of destruction manifestly constitutes neglect of the most heinous variety to save and preserve the insured property. *See Rockingham Mutual Ins. Co. v. Hummel,* 219 Va. 803, 250 S.E. 774, 776 (1979); *Klemens v. Badger Mutual Ins. Co.,* 8 Wis.2d 565, 99 N.W.2d 865, 866 (1959). Nor are we convinced that greater specificity, absent an explicit request, in explaining the nature of the neglect claimed by the insurance company is either necessary to prevent a waiver or required by the "good faith" rule. The reasons furnished the Molloys in St. Paul's denial of liability adequately notified the respondents of the grounds asserted in favor of noncoverage, and we accordingly hold that St. Paul did not waive its defense of arson.[4]

---

3. The policy additionally provided that the contract would be void in the event of any fraud or false swearing on the part of the insured and that the company would not be liable for loss occurring while the hazard is increased by any means within the control or knowledge of the insured.

4. Our conclusion here should in no way be understood as an implicit rejection of any of the several other arguments advanced by St. Paul, as supported by the amicus, to reverse the trial court's finding of waiver. Three of the seemingly more meritorious contentions are: 1. the defense of arson,

We now review the propriety of one other ruling of the circuit court asserted by St. Paul to have been erroneous, which we must consider in order to fully dispose of this appeal. The insurance company urges that since the insured residence was owned by the couple as tenants by the entireties, their interests are joint, and not several, and therefore the arson of one, if it exists, is to be treated as the misconduct of both, defeating recovery by either. As correctly noted by the circuit court, this is an issue of first impression in Maryland, although we observe that it has been a problem vexing the appellate courts of some of our sister jurisdictions for the past several years, and has resulted in discordant conclusions in these other states. *Compare, Mercantile Trust Co. v. New York Underwriters Ins. Co.,* 376 F.2d 502, 505-06 (7th Cir. 1967); *Hosey v. Seibels Bruce Group, S.C. Ins. Co.,* 363 So.2d 751, 753-54 (Ala. 1978); *Steigler v. Ins. Co. of North America,* 384 A.2d 398, 399-402 (Del. 1978); *Economy Fire and Cas. Co. v. Warren,* 71 Ill.App.3d 625, 28 Ill.Dec. 194, 390 N.E.2d 361, 363-64 (1979); *Hildebrand v. Holyoke Mut. Fire Ins. Co.,* 386 A.2d 329, 331-32 (Me. 1978); *Simon v. Security Insurance Company,* 390 Mich. 72, 210 N.W.2d 322, 323-26 (1973); *Howell v. Ohio Casualty Insurance Company,* 130 N.J.Super. 350, 327 A.2d 240, 242-43 (1974); *Delph v. Potomac Ins. Co.,* 95 N.M. 257, 620 P.2d 1282, 1284-85 (1980); *Winter v. Aetna Cas. & Sur. Co.,* 96 Misc.2d 497, 409 N.Y.S.2d 85, 87-88 (1978); *Lovell v. Rowan Mut. Fire Ins. Co.,* 274 S.E.2d 170, 171-74 (N.C. 1981); *Ryan v. MFA Mut.*

---

not a technical condition to recovery but a substantive defense designed in part to afford protection to the public, is not subject to waiver by an insurer as a matter of public policy, *see* Lawndale National Bank v. American Cas. Co., Reading, Pa., 489 F.2d 1384, 1388 (7th Cir. 1973); 2. the doctrine of waiver was misapplied by the trial court inasmuch as that principle was utilized to defeat a substantive defense when proper application of waiver is limited only to those technical policy provisions or conditions the invocation of which results in a forfeiture of otherwise existing coverage; and 3. the application of the doctrine of waiver by the circuit court in this case creates a liability for a contingency or risk not accepted under the insurance policy, thus effectively creating a new contract for the parties in violation of the rule of law existing in this State that "[i]nsurance coverage cannot be established by waiver." Neuman v. Traveler's Indemnity Co., 271 Md. 636, 654, 319 A.2d 522, 531 (1974).

*Ins. Co.,* 610 S.W.2d 428, 428-37 (Tenn. App. 1980); *see also Arenson v. National Automobile & Casualty Ins. Co.,* 45 Cal.2d 81, 286 P.2d 816, 818 (1955); *Everglades Marina, Inc. v. American Eastern Dev. Corp.,* 374 So.2d 517, 518-19 (Fla. 1979); *Auto-Owners Ins. Co. v. Eddinger,* 366 So.2d 123, 123-24 (Fla. App. 1979); *Hoyt v. New Hampshire Fire Ins. Co.,* 92 N.H. 242, 29 A.2d 121, 122-23 (1942) (permitting innocent co-insured spouse to recover), *with* such cases as *Mele v. All-Star Ins. Corp.,* 453 F.Supp. 1338, 1341-42 (E.D. Pa. 1978) (applying Pennsylvania law); *Short v. Oklahoma Farmer's Union Ins. Co.,* 619 P.2d 588, 589-94 (Okla. 1980); *Matyuf v. Phoenix Ins. Co.,* 27 Pa. D.&C.2d 351, 355-66 (1944); *Cooperative Fire Insurance Ass'n. of Vermont v. Domina,* 137 Vt. 3, 399 A.2d 502, 502-03 (1979); *Rockingham Mut. Ins. Co. v. Hummel,* 219 Va. 803, 250 S.E.2d 774, 775-76 (1978); *Klemens v. Badger Mut. Ins. Co.,* 8 Wisc.2d 565, 99 N.W.2d 865, 866 (1959) (cases not permitting recovery by innocent co-insured spouse). One view, properly referred to as the more traditional view, is often stated to be "that an innocent spouse may not recover under a fire insurance policy for damages resulting from the other spouse's fraud by deliberate burning of their jointly owned property." *Steigler v. Insurance Co. of North America, supra,* 384 A.2d at 399. As correctly observed by the Supreme Court of Delaware in *Steigler,*

> [t]his approach is bottomed on the premise that spouses who hold joint interests in insured property have a joint obligation to refrain from fraud, and so the fraud of one spouse necessarily becomes the fraud of the other. [*Id.,* 384 A.2d at 399.]

In analyzing this line of decisions, we observe that to the extent that the foundation of the traditional rule rests on the perceived link between co-ownership of property and a joint contractual obligation, whether the spouses hold the property by the entireties or in some other form of co-tenancy would seem to be of no consequence, for in either situation, each owner possesses an *undivided* interest in the *whole.* Indeed, whether the co-tenants are husband and wife, on the

one hand, or joint property owners lacking the marital relationship, on the other hand, under this view should be immaterial since in either of these cases a joint interest (sufficient to create a joint contractual obligation) in the insured property exists. Some courts have apparently accepted these logical extensions by applying the same type of rationale to other kinds of co-owners. See *Kosior v. Continental Ins. Co.,* 299 Mass. 601, 13 N.E.2d 423 (1938) (husband and wife as tenants in common); *Jones v. Fidelity & Guaranty Ins. Corp.,* 250 S.W.2d 281 (Tex. Civ. App. 1952), and *Klemens v. Badger Mutual Ins. Co., supra* (joint tenants); *Bellman v. Home Ins. Co.,* 178 Wis. 349, 189 N.W. 1028, 27 A.L.R. 945 (1922) (co-insured partners). Thus, if the underpinning of this view is properly conceived to be the interrelationship between the form of property ownership and the nature of the contract obligation, then there seems to us to be no valid reason to distinguish spouses holding property jointly from other co-owners.

While it is generally recognized that the tortious, or criminal conduct of a person is not attributable to his or her spouse simply by virtue of the marital relationship, *Hosey v. Seibels Bruce Group, S.C. Ins. Co., supra,* 363 So.2d at 753; *Shearer v. Dunn County Farmers Mutual Ins. Co.,* 39 Wis.2d 240, 159 N.W.2d 89, 93 (1968), it appears that several of the more recent decisions following the traditional approach have effectively done just this through their specific reliance on ownership in the form of tenancy by the entireties to defeat coverage for the innocent spouse. *See Lovell v. Rowan Mut. Fire Ins. Co.,* 46 N.C. App. 150, 264 S.E.2d 743, 747-48 (1980), *rev'd, supra,* 274 S.E.2d at 170-74; *Cooperative Fire Insurance Ass'n. of Vermont v. Domina, supra,* 399 A.2d at 503; *Rockingham Mut. Ins. Co. v. Hummel, supra,* 250 S.E.2d at 775-76. The paltry and rather conclusory reasoning of these courts, founded as it must be upon a "oneness theory [of marital relationships] which is, to say the least, somewhat 'quaint' in this day and age," *Steigler, supra,* 384 A.2d at 401, is unpersuasive to us, and we choose to align ourselves with the growing number of courts which set a more analytically persuasive tack.

In our opinion, whether an innocent co-insured, notwithstanding his or her spouse's misconduct, can recover under an insurance contract, depends primarily upon whether the parties intended, and thus whether the contract contemplates, the obligations of the co-insureds to be joint or several. *Accord, e.g., Hosey, supra,* 363 So.2d at 753-54; *Steigler, supra,* 384 A.2d at 400-01; *Hildebrand, supra,* 386 A.2d at 331; *Economy Fire and Cas. Co., supra,* 390 N.E.2d 363-64; *cf. Rent-A-Car v. Fire Ins. Co.,* 158 Md. 169, 179-81, 148 A. 252, 256-57 (1930). To hold otherwise would be to deny the parties to agreements insuring jointly owned property the ability to determine the nature of the co-insureds' contractual interests and obligations. The form and degree of ownership of the insured property is important to determine, first, whether a particular insured has an insurable interest in that property, and if so, second, the amount of benefits contractually due that insured following loss. Property ownership, beyond these considerations, however, in this context, is of minimal importance in determining liability, since the nature and extent of the various rights and obligations of the parties are governed by the terms of the insurance contract. In this regard, we are in accord with the recent opinion of the Supreme Court of North Carolina in *Lovell v. Rowan Mut. Fire Ins., supra,* 274 S.E.2d at 173, where it is said:

> The mere fact that property is held by the entirety should not, standing alone, bar the innocent spouse's recovery. "The unity of person of husband and wife [expressed through the tenancy by the entirety] gives no clue to the relationship that ought properly to obtain between the owners of the proceeds of insurance. . . ." *Hawthorne v. Hawthorne, supra,* 242 N.Y.2d at 51, 192 N.E.2d at 21. The insurance policy on the entirety property is a personal contract, appertaining to the parties to the contract and not to the thing which is subject to the risk insured against.

We find the fact that the property owned by the Molloy's was held by the entireties to be of no real significance to the resolution of the issue whether Mrs. Molloy may recover. As stated by the Delaware court, since "the case is fundamentally a contract dispute between an insurance company and a policy holder ... we look to the law governing that kind of problem rather than the law governing land titles." *Steigler, supra,* 384 A.2d at 400. Moreover, while allowing recovery by an insured for his willful act of burning would violate public policy,

> the defense of arson or willful burning will generally not operate to defeat an insured's recovery ... where ... there has been no finding that the insured directly set the fire, had knowledge and authorized its setting or later ratified the wrongful act. [*Hosey v. Seibels Bruce Group, supra,* 363 So.2d at 753; *Hildebrand v. Holyoke Mut. Fire Ins. Co., supra,* 386 A.2d at 331-32; *Pawtucket Mutual Insurance Company v. Lebrecht, supra,* 190 A.2d at 423.]

This Court's decision in *Rent-A-Car Co. v. Fire Ins. Co., supra,* 158 Md. at 179, 148 A. at 256, is consistent with this view, where our predecessors noted that a pyromaniacal mortgagor could not recover under an insurance policy, while holding that his innocent co-insured mortgagee was entitled to its share of the insurance benefits. Thus, there is no public policy barrier to recovery by an innocent insured spouse of insurance proceeds for the damage caused by the unilateral tortious or illegal act of the co-insured. The question, then, becomes one requiring contract interpretation.[5]

The rules utilized by the courts to aid in the construction of insurance policies, though generally well-known bear repeating here:

5. Although we intimate no opinion either as to its constitutionality or its applicability to property held by the entireties, we note the General Assembly, by Code (1957, 1979 Repl. Vol.), Art. 48A, § 367(c), has provided: A married woman may insure any property, real, personal or mixed, which she may own jointly or in severalty, in the same manner as if she were a feme sole.

> "[i]t is well settled that in interpreting insurance contracts, words are to be given their customary and normal meaning. Absent ambiguity the construction of the contract remains within the province of the court and Maryland has not adopted the rule, followed in many jurisdictions, that an insurance policy is to be most strongly construed against the insurer. If the language of the insurance contract is ambiguous, however, construction is for the jury,[6] and the ambiguity is to be resolved against the company which prepared the policy and in favor of the insured." [*Bond v. Pennsylvania Nat'l Mut.*, 289 Md. 379, 384, 424 A.2d 765, 768 (1981).]

The homeowner's insurance policy now before us designates "Charles J. Molloy and Diane M. Molloy" as "named insured," with the residents of the household, the named insured's spouse, relatives of either and any person under 21 years of age in the care of any insured being additionally defined as "insureds." Elsewhere in the compact, it is provided that the policy shall be void "in case of any fraud or false swearing of the insured" and that no liability shall exist in the event of "neglect of the insured to use all reasonable means to save and preserve the property. . . ." Thus, it appears that the obligations to refrain from fraud and to preserve the property are imposed not only on the named insured, but also on definitionally specified family members, dependents, and relatives. Nowhere in the policy is the precise nature of either the named insured's interest in the insurance contract or the insured's obligations under that contract specifically defined to be either joint or several. We have no hesitation in concluding that "an ordinary person owning an undivided interest in property . . . would naturally suppose that his individual interest in the property was covered by a policy which named him without

---

6. For a discussion of the jury's role in resolving contractual ambiguity, and in what situations it arises, *see* Montauk Corp. v. Seeds, 215 Md. 491, 496-98, 138 A.2d 907, 910 (1958).

qualification as one of the persons insured." *Hoyt v. New Hampshire Fire Ins. Co., supra,* 29 A.2d at 123. *Accord, e.g., Hosey, supra,* 363 So.2d at 754; *Steigler, supra,* 384 A.2d at 401; *Ryan, supra,* 610 S.W.2d at 437. A reasonable interpretation of the term "insured" as used in the fraud and non-preservation clauses, was made by the Supreme Judicial Court of Maine when it interpreted an identical provision to refer to "the insured who (1) is responsible for causing the loss and (2) is seeking to recover under the policy." *Hildebrand, supra,* 386 A.2d at 331. We believe that "there is much to commend the view that, unless the terms [of an insurance policy] are plainly to the contrary ... the obligation of the carrier should be considered several as to each person insured, and the fraud or misconduct of one insured should not bar recovery by the innocent co-insureds to the extent of their respective interests in the property involved." *Howell, supra,* 327 A.2d at 243. Regardless of whether the co-ownership is by the entireties or in another form, the "significant factor is that the responsibility or liability for the fraud — here, the arson — is several and separate rather than joint, and the husband's fraud cannot be attributed or imputed to the wife who is not implicated therein." *Id.* at 242. Thus, we conclude that the trial court correctly instructed the jury that this insurance contract provides coverage for each of the named insured's interests separately, and that the alleged incendiary act of Charles does not defeat liability to Diane for her share of the loss. Consequently, Diane is entitled to be compensated for damage to her interest in the property. Since "[w]e have regarded the rights of husband and wife [to be] separate under the contract, ... both logic and justice require that the amount recoverable be likewise allocated," so that the innocent spouse be compensated for one-half the damages within the limits of the policy. *Steigler, supra,* 384 A.2d at 402. Permitting recovery of more would necessitate reliance on the "oneness" legal fiction of marital property which we rejected in determining that the parties here enjoy and assume several, not joint, contractual rights and obligations. Moreover, an award greater than one-half would allow the

innocent spouse to recover in excess of that to which she would be entitled upon severance of the tenancy by the entirety, whether by divorce or other action of the parties. Since no one questions on appeal the amount or the correctness of the total damages awarded by the jury, we will direct the entry by the trial court of a judgment in favor of Diane Molloy for one-half of that amount.

*Judgment of the Court of Special Appeals reversed and case remanded to that court with instructions to reverse the judgment of the Circuit Court for Prince George's County and remand the case to that court for a new trial as to the claim of Charles J. Molloy against St. Paul Fire and Marine Insurance Company with respect to liability only, and for the entry of a judgment in favor of Diane M. Molloy for $43,807.14 plus interest from the date of the verdict on December 4, 1979.*

*Costs to be paid one-half by Charles J. Molloy and one-half by St. Paul Fire and Marine Insurance Company.*