**ERIE INSURANCE EXCHANGE,
Plaintiff–Appellant,**

v.

**Ray E. STARK; Dottie K. Stark,
Defendants–Appellees.**

**ERIE INSURANCE EXCHANGE,
Plaintiff–Appellee,**

v.

**Ray E. STARK; Dottie K. Stark,
Defendants–Appellants.**

**Nos. 90–2452, 90–2460.**

United States Court of Appeals,
Fourth Circuit.

Argued May 7, 1991.

Decided May 1, 1992.

Paul K. Geer, Jones, Gregg, Creehan & Gerace, Pittsburgh, Pa., argued, for Erie Ins. Exchange.

C. Robert Loskot, Bernstein, Sakellaris & Ward, Baltimore, Md., argued (Charles G. Bernstein, on brief), for Ray and Dottie Stark.

Before PHILLIPS, Circuit Judge, HALLANAN, United States District Judge for the Southern District of West Virginia, sitting by designation, and KELLAM, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

PHILLIPS, Circuit Judge:

This is an appeal and cross-appeal growing out of the denial by Erie Insurance Exchange (Erie) of a claim by Ray and Dottie Stark for fire damage loss under their homeowner's policy with Erie. The principal issue is whether the policy covered the loss, which indisputably was caused by Ray Stark's setting fire to the residence in the course of an alleged effort to commit suicide by self-immolation. We conclude that genuine issues of material fact respecting Ray Stark's conduct and purpose in causing the fire and his mental state at the time made summary judgment in the Starks' favor improper. We affirm the district court's dismissal of the Starks' tort counterclaims based upon Erie's conduct in denying their insurance claims.

### I

On July 25, 1988, Ray Stark visited the grave of his recently deceased son. Ray had been suffering severe depression due to his son's death, one month earlier, in an automobile crash. After leaving the cemetery, Ray consumed a substantial amount of alcohol, became very drunk, and returned to his home in Lonaconing, Maryland. There he quarreled violently with his wife, Dottie. He then left the house, got in his car, and began ramming it into his wife's car. Dottie Stark called Ray's father for assistance. Ray's father came to their house and tried to take Ray's car keys away from him. When he was unable to do so, Dottie called the Maryland State Police for help.

Before the police arrived on the scene, Ray left the area. The police told Dottie, and their daughter Kelli, to leave the house. At some point later that evening, Ray returned, spread gasoline about the house and ignited it. When firefighters arrived, they found Ray lying 100 yards from the house, suffering second and third degree burns on his legs and feet.

Ray was taken to Memorial Hospital in Cumberland, Maryland where in due course he was interviewed and treated by a psychiatrist, Dr. Veluppillai Nagulendran. Dr. Nagulendran diagnosed major depression and placed Ray on anti-depressant medication. Dr. Nagulendran later saw Ray in psychotherapy on nine occasions during the month in which Ray remained in the hospital. He also treated Ray on four occasions following his discharge from Memorial Hospital.

In deposition testimony and a letter report later included in the summary judgment materials, Dr. Nagulendran opined, on the basis of Ray's account to him and of his ensuing psychiatric treatment, that Ray had set fire to the house in the course of attempting to commit suicide by pouring gasoline on himself and igniting it, and that, as Ray claimed, he did not intend to set the house on fire. He attributed the suicide effort to Ray's deep depression. He concluded that though Ray was mentally able to form the intent to commit suicide by this means, he was then experiencing a "severe form of mental disorder" such that he "didn't know right from wrong" and "lacked substantial capacity to appreciate the criminality of his alleged conduct or to conform his conduct to the requirements of the law." J.A. 364–65, 376–77. When the state instituted a criminal arson charge against Ray, a state court judge on a preliminary hearing found no probable cause based on the portion of Dr. Nagulendran's medical opinion just quoted. The judge thought this "raised a substantial question with regard to" the state's ability to prove the essential element of "malice" under state law, and accordingly dismissed the charges. J.A. 155–56.

The day after the fire, Dottie Stark had filed an insurance claim under the Starks' homeowner's policy with Erie. Erie denied coverage. The parties could not resolve the dispute amicably. Erie made repeated

demands for information from the Starks. The Starks' responses were, in Erie's estimation, inadequate. Erie therefore filed this action in the District of Maryland, seeking a declaration of noncoverage. In particular, Erie relied upon the increase in hazard, neglect, and intentional loss clauses in the insurance contract. The Starks counterclaimed for breach of contract, conversion, and tortious interference with prospective advantage. The district court dismissed the conversion and tortious interference counterclaims, under Rule 12(b)(6). On cross-motions for summary judgment on the opposing policy-coverage claims, the court then ruled against Erie and for the Starks on Erie's claim of non-coverage, holding Erie liable under its policy for the fire damage to the Stark residence and contents. The court gave a joint judgment to the Starks for the amount of the loss reduced by an offset for insurance proceeds paid under the policy to the Starks' mortgagee. The Starks filed a motion for attorney fees and a motion for prejudgment interest. The court denied both motions.

Erie appealed from the adverse judgment on policy coverage, and the Starks cross-appealed the district court's dismissal of their tort claims and denial of their motions for prejudgment interest and attorney fees.[1]

## II

The critical issue on appeal is whether the district court erred in determining that, as a matter of law on the summary judgment record, Erie's insurance policy covered this incendiary fire loss. In so concluding, the court rejected each of the three substantive grounds upon which Erie relied to defeat recovery:[2] that Ray Stark's undisputed act of setting fire to the residence violated the policy's (1) "intentional act" exclusion; (2) its "increase in hazard" provision; and (3) its "neglect" exclusion.

The court rejected each of these on the same legal basis: that each of these policy provisions required a particular state of mind that Ray Stark indisputably was incapable of possessing, being "quite insane (mad)," J.A. 35, at the critical time. The court found "insanity" having that disabling effect on the basis of Dr. Nagulendran's deposition and report. The court apparently considered the critical facts and inferences embodied in Nagulendran's opinion—Ray Stark's immediate purpose (suicide) and mental state (incapable of distinguishing right from wrong)—indisputably established (not in genuine issue) simply because Erie did not oppose that medical opinion with a countering expert opinion. See J.A. at 220 (ruling on motion to reconsider).

We conclude that the court erred in granting summary judgment on this basis. Assuming, as we do, and as will later be discussed, that under Maryland law some forms of "insanity" might preclude possession of the particular mental states required to invoke each of these coverage-avoiding provisions, there yet are genuine issues of material fact which do not allow that to be determined as a matter of law on

---

1. In the district court, Dottie Stark moved individually for "partial summary judgment," contending that under Maryland law, see St. Paul Fire and Marine Ins. Co. v. Molloy, 291 Md. 139, 433 A.2d 1135 (1981), she was entitled as an "innocent spouse" to recover a portion of the insurance proceeds proportionate to her ownership interest without regard to any voiding conduct by her co-insured. From the record materials included in the parties' joint appendix, we cannot tell whether the district court expressly denied her motion or simply declined to rule on it in view of the grant of a joint judgment for the full amount of the loss to the co-insured parties. In any event, Dottie Stark, as cross-appellee, has not raised this as an alternative basis for affirming the judgment (as appropri-

ately modified) in her behalf. Accordingly that issue is not before us. Whether it could be considered still alive as an alternative claim for proportional recovery by Dottie Stark we leave for first instance consideration by the district court on the remand we order. As indicated, it is not apparent from the record whether the district court has ruled directly upon it so that failure to raise the issue on appeal could be thought to have waived it.

2. Erie also denied coverage on the basis of the Starks' alleged failure to comply with certain proof-of-loss conditions in the policy. The district court rejected this defense, and Erie does not challenge that on this appeal.

this summary judgment record. Specifically, we perceive genuine issues as to (1) whether Ray was in fact attempting to commit suicide or instead accidentally burned himself in the course of deliberately setting fire to the residence; and (2) whether, assuming a bungled or aborted suicide attempt, this demonstrated a form of "insanity" that precluded possession of the particular mental states required to invoke any of the non-coverage provisions.

These two issues obviously are of "material" fact, being, in conjunction, dispositive of the ultimate coverage claim. They also are "genuine issues" not subject to resolution by summary judgment, as a careful assessment of the summary judgment record demonstrates. We turn now to that assessment, taking first the issue of Stark's actual purpose.

### A

Contrary to the district court's expressed view that "it is not reasonably open to dispute that the fire was caused by Ray Stark's attempted self-immolation," we think that is a disputable factual issue on this record. The district court relied essentially upon the fact that Dr. Nagulendran's opinion of a suicidal purpose was not countered by an opposing expert opinion. J.A. 35 (on motion for reconsideration). But summary judgment doctrine does not dictate that result. Neither the factual assumptions underlying an expert's opinion nor the expert's inferences from the facts assumed are automatically established by the absence of directly countering expert opinion. Certainly that is so when the credibility of the source for the expert's factual assumptions is put in issue by internal inconsistencies in, or external contradictions of, the source's account. That surely is the case here. The sole source of Dr. Nagulendran's factual assumptions leading to his suicidal purpose opinion was Ray Stark's account of his conduct and intentions. And that account—of the circumstances leading to the fire's ignition, of his purpose in setting the fire, and of the act of ignition itself, as given to Dr. Nagulendran—is inconsistent with later accounts given by Ray Stark. Furthermore, it is implicitly contradicted in critical respects by sworn testimony of a deputy fire marshal who investigated the fire damage shortly after the fire. As Erie points out, it is as readily inferable from the total record that Ray's purpose was, in part at least, to set fire to the residence as it was solely to set fire to himself. We identify the most obvious of the inconsistencies in and contradictions of Ray Stark's account.

Two days after the fire, on July 27, 1988, Ray Stark gave Dr. Nagulendran a detailed account of his conduct leading up to and culminating in the fire's ignition. This, he said, occurred when he "splashed gasoline on himself inside the house and set fire." J.A. 127 (Nagulendran deposition).

Once litigation was underway, however, and Ray's actual purpose in setting the fire had been challenged by Erie, the Starks took the position that Ray had no recollection of the critical events. In deposition testimony on December 20, 1988, Ray asserted that he had "blanked out" and "remembered nothing" of those events. J.A. 183 (Ray Stark deposition). This position was also taken by the Starks in answer to interrogatories. J.A. 122.

By the time, however, that the Starks later moved for summary judgment, their formal position, as reflected in a supporting brief, was that "Ray Stark obtained gasoline, spread it about the house and in some way caused the ignition of the fire." J.A. 199 (quoted in Erie's response).

While these glaring inconsistencies in the apparent ability of Ray Stark to account for his conduct from time to time, and in his varying accounts of where he "splashed" or "spread" the gasoline ("on himself inside the house," or "about the house") might be explainable as the result of shock or trauma or the like, that certainly is not the only reasonable inference. It is at least as inferable, on the record as a whole, that they reflected a deliberate attempt, by denying at one point a recollection earlier possessed, to support the suicide theory relied upon to counter Erie's non-coverage position.

More critical than these internal inconsistencies in the Starks' positions, however, are the contradictions of the Starks' suicide theory that are implicit in the sworn testimony of Fire Marshal Corolla. On the basis of his physical inspection of the premises soon after the fire, Corolla concluded that a "flammable liquid or accelerant had been used, *splashed about freely,*" in the basement area of the Stark residence. Furthermore, he concluded that though the basement area was the principal source of fire in the residence, it was not the only one. He described evidence that separate fires had been set to two chairs and a picnic table on a screen porch at the ground level of the residence, and opined that there was "no connection between the fire area in the basement and the back porch." J.A. 295, 297, 300 (emphasis added).

Critical to the Starks' suicide theory, as espoused by Dr. Nagulendran, is that Ray Stark's effort was focussed narrowly on self-immolation, and not on damage, even incidental, to the residence. The fire marshal's unrebutted testimony about the evidence of a widespread splashing about of some flammable in the basement area, coupled with evidence of separate, unconnected fire-settings in other areas of the residence necessarily draws the suicide-only theory in issue. While, if accepted, it does not necessarily negate that theory, it certainly provides a rational basis for its rejection. It is compatible with Erie's theory, formally advanced, that what Ray Stark was truly about, and knowingly about, was doing further damage to the residence out of the same sense of rage that clearly could be inferred to have caused him to damage the Starks' automobiles. What he was actually about, whether the one or the other, is a genuine issue of material fact on this record.[3]

If this factual issue is resolved against the Starks' suicide-only theory, their claim of coverage must fail with it. While, theoretically, Ray Stark's mental state might also be found such as to negate all of Erie's coverage-avoidance defenses even if his purpose was not solely to commit suicide, the Starks are precluded from recovery under any such theory here. They have never advanced it as an alternative, but have relied throughout solely upon their suicidal-purpose-only theory. Issue has been joined throughout on that narrow basis, and the district court granted summary judgment solely on that basis. While inconsistent factual theories of claim or defense are expressly allowed in federal practice, Rule 8(e)(2), Fed.R.Civ.P., that has not been attempted here.

B

■ On the other hand, resolution of the suicidal-purpose-only theory in the Starks' favor would not be dispositive of the coverage issue against Erie. It would simply lead to the second issue: whether the mental state thereby demonstrated was such as to negate all of the coverage-avoidance defenses relied upon by Erie. As earlier indicated, the district court, relying essentially on Dr. Nagulendran's opinion based upon his suicidal-purpose-only assumption, concluded that the mental state described by Dr. Nagulendran did negate all of Erie's defenses. For reasons that follow, we conclude that this was error, even if Nagulendran's assumption of suicidal purpose is confirmed as fact.

To show why requires, preliminarily, a closer look at the three coverage-avoidance provisions relied on by Erie, and the basis upon which the district court found each of them necessarily negated by Ray Stark's mental state.

The first is the "increase in hazard" provision, which provides in relevant part that "coverage is suspended if the hazard is substantially increased by any means within the control or knowledge of anyone we protect."

---

**3.** Nothing in the only evidence of record respecting Ray Stark's exact mental state—the medical opinion advanced by Dr. Nagulendran—suggests that he was without volitional capacity to have *any* purpose. Rather, the opinion given conceded that Stark "was able to form the intent to commit suicide ... to plan that," and accepted that Stark had the capacity to intend not to set fire to the house. J.A. 381–82 (Nagulendran deposition).

■ The district court, presumably relying on decisional law which interpreted this standard provision as excluding coverage for acts "reasonably calculated to increase the risk," *see, e.g., Plaza Equities Corp. v. Aetna Casualty and Surety Co.,* 372 F.Supp. 1325, 1331 (S.D.N.Y.1974), opined in effect that Ray Stark's mental state was such as to preclude his ability to "reasonably calculate" anything. J.A. 34–38. We think this misreads the interpretive formula. Rightly read, it does not posit a subjective state of mind—"calculated" as "rationally formed plan," but merely an objective question—"calculated" as "likely to cause." The key language, so far as mental state is concerned, is "within [Ray Stark's] control or knowledge." While Erie claims that this provision contains no state of mind requirement, we think this goes too far. It implies at least the mental capacity to "control" or "have knowledge of" a means by which an insured hazard is increased—i.e., a basic volitional and cognitive capacity. But that, we believe, is its limit. The district court obviously required more in its assessment of Ray Stark's mental capacity.

The next provision is the "neglect exclusion," which in relevant part excludes coverage for "loss resulting ... from neglect of [an insured] to use all reasonable means to protect covered property at and after the time of loss or when property is threatened by a [covered] peril...."

The district court found this exclusion negated by the fact that "Stark's mental irresponsibility" precluded its application.

■ Here again, we think Erie's contention that this provision contains no state of mind requirement claims too much. "Neglect" also implies at least a cognitive capacity to recognize alternative courses of conduct and the relative risks of choice between them, and the volitional capacity then to make conscious choice between them. Whether this was the state of mind which the district court sought to express we cannot say. But whether it was a state of mind which Ray Stark was incapable of possessing at the critical time is, on the summary judgment record, a genuine issue of fact that, as we will show, could not be resolved as a matter of law.

■ The final provision, and the one most directly relevant to the circumstances of this case, is the "intentional act exclusion." This, in relevant part, excludes coverage of "any loss arising from an act committed by [an insured] with the intent to cause a loss." This provision—as Erie necessarily concedes—is one which clearly contains a state of mind requirement: actual intention to cause a loss to the insured residence. The district court found this state of mind clearly negated by Ray Stark's "insanity." By this, the court obviously considered that Stark's suicidal purpose—which the court accepted as fact—demonstrated a lack of basic volitional capacity, i.e., the capacity to "intend" anything.

Here again, we believe that even if suicidal purpose is first found as fact, the summary judgment record does not warrant a determination that this demonstrates, as a matter of law, that Ray Stark could not be held to have "intended to cause a loss to the residence."

In sum, we conclude that even if it were established that Ray Stark's sole purpose in setting the fire was to commit suicide, this would not, as a matter of law, demonstrate a state of mind that negated each of the coverage-avoidance provisions. While we agree with the Starks that each of the provisions does assume a certain level of mental capacity whose absence would negate the provision's applicability, we disagree with the district court's conclusion that Ray Stark's suicidal purpose would necessarily demonstrate the absence of the specific mental capacity contemplated by each of the provisions. Our essential point of disagreement is with the district court's apparent belief that *any* state of "insanity" would necessarily negate each of the coverage avoidance provisions. Controlling law requires a more specific inquiry into the exact form of the undeniably abnormal mental state of one attempting suicide in order to determine whether it is a form that negates these coverage-avoidance pro-

visions. We turn now to that controlling law, which is Maryland's.

We find it most recently analyzed in a decision of this court rendered by happenstance while this case was pending final decision in the district court. In *Reinking v. Philadelphia American Life Ins. Co.,* 910 F.2d 1210 (4th Cir.1990), a panel of this court considered whether under Maryland law a policy provision excluding medical benefits coverage for "intentionally self-inflicted injuries" applied to an attempted suicide. The *Reinking* court interpreted Maryland law as making such a provision's applicability turn on whether the injured party's mental state, even if concededly some form of "insanity," was more specifically one which precluded intentionality, i.e., in this context, "the ability to make a meaningful choice between committing and not committing suicide." *Id.* at 1216. Critically for our purposes, the court concluded that under the Maryland decisions such a lack of capacity to act "intentionally" could be found in only two forms of "insanity." The first is a "delusional" form, in which the actor simply does not even "understand the physical consequences of an act." (The court gave as an example one who believed that in stabbing herself with a knife she was drawing pictures with a pen.) The other is an "insane impulse" form in which the actor is unable to resist doing the act in issue, i.e., lacks volitional capacity. *Id.* at 1215.[4]

In the *Reinking* case, the district court had expressly found as fact that the insured party fell into the "insane impulse" category, that she could not resist the impulse to take her life and was therefore "mentally incapable of forming an intent to injure herself." *Id.* In the face of flatly contradictory expert opinion evidence on the issue of the insured's capacity for rational thought—her capacity to act "intentionally"—the court affirmed the district court's critical finding as not clearly erroneous.

Applying that body of Maryland insurance law to this case therefore requires a specific determination whether Ray Stark's mental state was of either the "delusional" or "insane impulse" type. Only if one or the other were found could Ray Stark's suicide attempt be found not a volitional or "intentional" act. And only so could the Starks' claim of coverage succeed against all of Erie's coverage-avoidance defenses. Most obviously, unless lack of basic volitional capacity were found on either a "delusional" or "insane impulse" basis, the Starks' claim of coverage would fail under the "intentional act" exclusion.

The only scientific evidence of Ray Stark's mental state in the summary judgment record—Dr. Nagulendran's medical opinion—obviously does not suffice to establish such a specific mental state as a matter of law. Though not directly contradicted by opposing expert opinion, it does not purport to identify either a "delusional" or "insane impulse" form of insanity. In fact, it would seem to negate any notion of delusional incapacity, and nowhere suggests anything comparable to an irresistible impulse. Indeed, the closest that this medical opinion comes to identifying a specific mental state resulting from Stark's diagnosed depression is the suggestion that Ray Stark "didn't know right from wrong" and "lacked substantial capacity to appreciate the criminality of his alleged conduct or to conform his conduct to the requirements of the law." J.A. 364–65, 376–77. This assessment, most obviously aimed at the criminal scienter standard, simply does not touch the basic volitional issue dispositive of this civil claim.

For the above reasons, there remains a genuine issue of material fact as to whether Ray Stark's mental capacity—even assuming his sole purpose was to commit suicide—was such as to negate Erie's "intentional act" coverage defense.

---

4. A third category of "insanity" was recognized in which the person "cannot appreciate the moral character of an act." *Reinking,* 910 F.2d at 1215. In this case, as in *Reinking,* that category is irrelevant to the specific issue joined by the parties. The Starks do not contend that Ray Stark lacked that particular capacity nor that if he did, it negated the mental state requirements of any of the coverage-avoidance provisions.

## C

The Starks have an alternative position that must be addressed. It depends upon a prior determination that Ray Stark's purpose was only to set fire to himself. They contend that even if it be determined that he had the mental capacity to do this act intentionally, such an intentional act could not be considered one directed at the insured premises, hence would not invoke any of the coverage-avoidance defenses. They therefore urge this as an alternative basis for affirming the summary judgment in their favor on the policy coverage issue.

This contention is foreclosed, as a matter of law, by the Maryland rule that where the consequences of an intended act by an insured were substantially certain to result from the intended act, the insured is charged as a matter of law with intending the consequences as well as the act. *See Harpy v. Nationwide Mutual Fire Ins. Co.*, 76 Md.App. 474, 545 A.2d 718, 723 (1988) (distinguishing *Allstate Ins. Co. v. Sparks*, 493 A.2d 1110 (Md.App.1985), on basis insured in that case did not intend act itself). Here, it is obvious that one with the mental capacity to intend to set fire to himself who then does so in the way indisputably used here must be charged with knowledge that the residence will suffer fire damage as a consequence.

## III

We next consider the Starks' cross-appeal in which they challenge the district court's denial of their claim for attorney fees and prejudgment interest, the court's assessment of the damages to which they were entitled on their policy claim, and the court's dismissal of their conversion and tortious interference with prospective advantage claims.

In view of our reversal of the district court's summary judgment in favor of the Starks on their principal contract claim, the questions of attorney fees, pre-judgment interest, and damage calculation are mooted and need not be considered.

We have considered the claimed errors in dismissing the Starks' two tort counterclaims which essentially complained of economic injury caused by Erie's handling of their insurance claim. The court found both claims as pleaded not cognizable under Maryland law, and we find no merit in the Starks' challenge to that legal conclusion. We therefore affirm those dismissals on the reasoning of the district court.

## IV

For the reasons discussed in Part II, we must vacate the summary judgment in favor of the Starks, and remand the coverage issue for further proceedings consistent with this opinion. How specifically the dispositive factual issues should be put to trial is best left to the district court. In view of the obvious complexity and interrelatedness of those issues, we offer these thoughts for such guidance as the district court may find appropriate and helpful.

We have identified two genuine issues of material fact that require resolution to determine policy coverage: whether Ray Stark's sole purpose was, as the Starks claim, to commit suicide and not to set fire to the residence; and whether, even if his sole purpose was suicide, his mental state nevertheless was such that he could be held to have "intended" the act of attempted suicide. Though these are obviously closely interrelated issues conceptually, we have identified them as separable issues largely because the parties have joined issue upon them as if they were. So considered, they necessarily contemplate that Ray Stark's "purpose" in setting the fire can be addressed as a question independent of the question whether at the time of that act he had the mental capacity to "intend" it (or *any* act) so as to invoke any of the coverage-avoidance provisions of the insurance policy. We believe that despite any seeming conceptual difficulty, relevant legal principles do indeed permit considering these issues as separable ones whose resolution, either sequentially or contemporaneously, will resolve the ultimate coverage issue as joined by the parties. That of

course is the path of resolution generally suggested by our analysis of the case.

It would also seem possible, however, in view of the parties' litigating positions and certain aspects of our holding that now constitute the law of the case, to view the dispositive factual issue as now a single one: whether at the time Ray Stark indisputably set fire to the residence, and himself, he had the mental capacity to "intend" that act, within contemplation of controlling Maryland insurance law.

This follows from the following propositions:

1. It is indisputable that if he had the mental capacity to "intend" anything, he "intended" to set the fire that damaged both the residence and himself. There is no evidence and no one suggests that the act of ignition itself was accidental.

2. Whether, having the requisite mental capacity, he "intended" only to burn himself, or the residence, or both, is irrelevant to the coverage issue under Maryland law. For under that law and the undisputed facts of record, even if he intended only to set fire to himself, he is nevertheless charged with intending the "substantially certain" consequence of damage to the residence.

3. And if he "intended," either directly or by legal implication, to cause damage to the residence, coverage is specifically excluded by the policy's "intentional act exclusion" (whether or not it might also be excluded by either of the other possibly more questionable coverage-avoidance provisions).

4. This means that only if he did not have volitional capacity—the capacity to "intend" anything—would coverage not be excluded under the policy and the undisputed facts of record.

5. The question of mental capacity in this specific sense—of capacity to intend anything—is therefore dispositive of the ultimate coverage issue under Maryland law.

6. Resolution of this question, per *Reinking*, turns on whether at the time Ray Stark suffered from a form of insanity which explained his conduct as either "delusional" or the result of an "insane impulse" rather than as an "intentional" act in the freely volitional sense. Relevant to this issue (rather than being a separable issue) is the question whether what Ray Stark was truly about (his purpose) was suicide or damage to the residence. For a suicidal purpose is obviously more suggestive of the existence of some form of "insanity," hence of a possibly "delusional" or "insane impulse" form.[5]

AFFIRMED IN PART, VACATED AND REMANDED IN PART.

---

5. Indeed, we have held in Part II that if the suicidal-purpose-only theory were separately submitted and resolved against the Starks, this should be dispositive of their coverage claim.

In effect this finds in their exclusive reliance upon this factual theory a concession that only if Stark's sole purpose was self-immolation could incapacitating "insanity" be found.